657 So.2d 282 (1995)
IP TIMBERLANDS OPERATING COMPANY, LIMITED and International Paper Company
v.
DENMISS CORPORATION and Denkmann Associates, et al.[1]
No. 93 CA 1637.
Court of Appeal of Louisiana, First Circuit.
May 23, 1995.
Rehearing Denied June 28, 1995.
*286 Phillip W. Wittman, New Orleans, Michael H. Rubin, Paul West, Baton Rouge, Elaine Spencer, Seattle, WA, Jackie W. Rozier, Jackson, MS, for plaintiffs/appellants, IP Timberlands Operating Co., Ltd. and Intern. Paper Co.
William C. Roedder, Jr., Mobile, AL, Ross F. Bass, Jr., Jackson, MS, John R. Tharp, Margaret Tooke, Baton Rouge, James A. Smith, Seattle, WA, Rayford L. Etherton, Jr., Mobile, AL, for defendants/appellants, Denmiss Corp. and Denkmann Associates.
*287 Before: LOTTINGER, C.J., and WATKINS, FOGG, WHIPPLE and PITCHER, JJ.
WATKINS, Judge.
This lawsuit involves various rights to approximately 95,000 acres of non-contiguous timberlands in southeast Louisiana. The plaintiffs and first appellants are Denmiss Corporation and Denkmann Associates, plus 48 individual mineral distributees[2] collectively, "Denkmann" or "plaintiffs"). The defendants and appellees/cross-appellants are IP Timberlands Operating Co., Ltd. and International Paper Company (collectively, "IP" or "defendants"). Both sides appeal a judgment rendered on a jury award of $100,000 following a four-month trial, and a later judgment notwithstanding the verdict (JNOV) that awarded an additional $2,056,905 in damages; each side filed an answer to the other's appeal.

BACKGROUND
During the early 1940s, the timberlands in question were owned by Natalbany Realty Company and Natalbany Lumber Company (collectively, "Natalbany"), the latter having been formed in 1902 to operate the Natalbany sawmill as a joint project of the Denkmann and Weyerhaeuser families. By December of 1941, Natalbany's timberlands were in poor condition, and the corporation was deeply indebted to its sister company in Mississippi, Denkmann Lumber Company. Natalbany's board of directors decided to implement a plan to wind up the affairs of the insolvent company.
First, Natalbany granted a comprehensive oil and gas lease to Cities Service Oil Co. covering the minerals underlying the Louisiana lands. Then, subject to the lease, Natalbany transferred its mineral rights to its own shareholders, the "mineral distributees"[3] previously identified. Finally, Natalbany transferred the timber and the land, less the mineral rights, to Denkmann Lumber Company, which accepted the dation valued at $471,828 in partial satisfaction of Natalbany's debt.
*288 In 1945 Denkmann Lumber Company entered into a contract ("1945 Agreement") with a subsidiary of IP, Southern Kraft Timberland Corporation ("Southern Kraft"). Denkmann (as "vendor") conveyed to Southern Kraft (as "vendee") "the timber, trees, wood and other forest products ... standing, growing and being situated, or that may in the future ... stand, grow or be situated" on 95,000 acres for a term of 99 years. Consideration for the "sale," the "lease," and the "future operating and cutting privileges" was a cash price equal to the fair market value of the standing timber, which amounted to $2,445,000. Additionally, Southern Kraft obligated itself to pay annual taxes on the land and the timber, including any severance taxes on the timber but excluding any taxes separately assessed on minerals or increases in the land assessments directly caused by mineral development. There was no general termination provision in the 1945 Agreement.[4]
The vendee's use of the land was to be governed by good forestry practices, and the 1945 Agreement specified:
It is agreed and recognized that one of the primary purposes for which the Vendee hereunder is acquiring said property and its rights hereunder, is the right to use the said lands in the future during the life of this contract for the purpose of growing timber, wood and other forest products, and promoting the supply, stand and growth of timber, wood and forest products on the land, and removing and marketing the same from time to time and at will, which right of the Vendee is in the nature of a lease of the land upon which the timber stands for said purposes, and that the consideration paid herefor covers all such rights and privileges as herein provided, in addition to the purchase of the timber, wood and other forest products presently on said property.
Denkmann reserved to itself the "right to make and grant any and all oil, gas, gravel and other mineral leases and contracts necessary or desirable to the full mineral development of the said lands...." The reservation included the surface rights necessary for the performance of mineral contracts and for full mineral development. Southern Kraft agreed that if Denkmann required "exclusive" use of any of the lands for mineral development, Denkmann's right would be "paramount" to any rights being conveyed in the 1945 Agreement, provided the value of forest products lost or damaged be paid.
Finally, the 1945 Agreement contained an option to purchase the land, which option was to be exercised any time between January 1, 1986, and December 31, 1995. Denkmann granted Southern Kraft the option subject to a "full reservation" to itself of all mineral rights. The option clause provided that three arbitrators would be named to fix a price when the option was exercised.
Twenty-four years after the 1945 Agreement, the parties signed a second agreement ("1969 Agreement"), confirming the parties' interpretation of the first one. The only additional rights conveyed in the 1969 Agreement dealt with sub-leases for recreational purposes, such as, hunting and fishing leases.

LITIGATION
On August 15, 1986, IP filed in federal court an action seeking relief in the form of a declaratory judgment interpreting the option clause in the 1945 Agreement and an injunction prohibiting Denkmann from interfering with IP's rights under the Agreement, including the option granted to IP.
On the same date, August 15, 1986, the Denkmann corporations, but not the individual mineral distributees, filed an action seeking damages for breach of contract and termination of the 1945 Agreement. Denkmann alleged that the contract had been breached in the following ways: 1) failure to use good forestry practices; 2) allowing encroachments on the land with resultant losses of acreage to third parties; 3) unauthorized permitting of trash sites to be established on the lands; and 4) unauthorized grants of *289 surface leases to third parties. Additionally, Denkmann alleged that the 1945 Agreement had expired in 1975 by operation of law because the provisions of the 1945 Agreement amounted to a usufruct to a corporation, which is limited to a 30-year duration.
Two years after the filing in federal court, on November 15, 1988, the Denkmann corporations amended their complaint to allege breach by mineral trespass, and the mineral distributees became parties.
The actions were consolidated in federal court, but later they were dismissed for lack of diversity[5] and refiled in state court.
After the parties were realigned to designate Denkmann as plaintiffs and IP as defendants, the trial began on September 23, 1991. At the end of a four-month trial, the court provided the jury with 21 questions to be answered in rendering its verdict. The jury returned its verdict on January 24, 1992.
The jury found that the 1945 Agreement was a sale of the standing and "future" timber and a lease of the land, not a limited "right to cut" the standing timber and a "usufruct" as Denkmann contended. The jury found no breach of contract by failure to use good forestry practices, by encroachments, by trash sites, or by interference with minerals. The jury did find a breach occurred by IP's surface sub-leasing and found that damages for that breach amounted to $100,000. However, the jury found the contract divisible and rejected Denkmann's prayer for termination of the contract. (See Appendix.)
As to the pleas of prescription and estoppel made by IP, the jury made the following responses: that Denkmann Associates and Denmiss Corporation knew or should have known of the damage prior to December 19, 1975, in reference to the allegations of good forestry practices, encroachments, waste sites, surface leasing, and interference with minerals; that the mineral distributees knew or should have known of their damages prior to December 19, 1984, and prior to December 19, 1975; that the two Denkmann corporations were estopped from terminating the 1945 Agreement. The jury also found that the option clause was enforceable. (See Appendix.)
On February 27, 1992, the trial judge rendered a judgment purportedly pursuant to the jury verdict, awarding Denkmann $100,000 in damages for surface leasing, denying termination of the contract, declaring the option enforceable, and ordering specific performance of Denkmann's obligations under the option clause.
IP filed two post-trial motions: a motion to conform the judgment to the jury verdict, or, in the alternative, a motion for a partial JNOV. Denkmann also filed two post-trial motions: a motion for JNOV or, in the alternative, a motion for new trial.
The trial court denied both of IP's motions, but granted part of Denkmann's motion for JNOV. The trial court found that the granting of permits for geophysical exploration by the defendants violated the 1945 Agreement and entitled plaintiffs to damages for interference with mineral interests. In granting the partial JNOV, the trial court noted that Denkmann had met its burden of showing that the facts and reasonable inferences pointed so strongly and overwhelmingly in its favor that reasonable persons could not arrive at a contrary verdict. After determining that a partial JNOV was proper, the trial court awarded an additional $2,056,905 for that element of damage.
The second judgment was rendered on May 10, 1993, and both sides to the controversy perfected their appeals.

ERRORS ASSIGNED
Plaintiffs' 27 assignments of error fall into nine categories: 1) nullity of the 1945 Agreement; 2) characterization of the 1945 Agreement as a usufruct; 3) breaches of the 1945 Agreement by the defendants; 4) inadequate damages; 5) prescription and estoppel; 6) nullity and unenforceability of the option clause; 7) various rulings and actions of the *290 trial court; 8) legal interest; and 9) costs of court.
In two assignments of error[6] pursuant to their cross appeal, defendants complain of the two judgments awarding first $100,000 and then $2,056,905 on the ground that the trial court failed to recognize the jury's responses to interrogatories on prescription and estoppel. In a third assignment of error[7] defendants urge that the JNOV of May 10, 1993, was not supported by the record and, therefore, was improperly granted.

WAS THE AGREEMENT VOID AB INITIO?
Denkmann argues that the 1945 Agreement is an absolute nullity because the contracting parties circumvented the public policy embodied in two rules of Louisiana law: the 30-year limitation on a usufruct held by a corporation, LSA-C.C. art. 608 (formerly art. 612), and the 10-year prescription of nonuse applicable to a reservation of minerals, LSA-R.S. 31:16. The plaintiffs base this argument, in part, on the following language from the trial court's written reasons for judgment:
The Agreement at the heart of this controversy is a contract entered into between these parties and their predecessors. The contract's design was to avoid two (2) Louisiana laws and public [policies]. The Denkmann group sought to avoid the ten (10) year liberative limitation on the holding of mineral rights on others' lands without use, while avoiding maintaining and protecting the land. The IP group sought to avoid the thirty (30) year limitation on holding the right of use and fruits on the lands of another. In order to avoid these two (2) specific Louisiana limitations, the parties carefully designed [the] 1945 Agreement to combine the elements of sale and lease. The parties have attempted to sell future growth for ninety-nine (99) years, while the landowner sought to avoid the liberative prescription on minerals (sic) rights by not selling the land. To further these matters, the vendors made their rights to the minerals, both exploration and production, paramount to all other rights transferred to the vendee.
The plaintiffs argue that the result of the above "finding" is the nullity of the agreement, and that the trial court erred in not declaring the nullity.[8]
It is important that we distinguish the plaintiffs' absolute nullity argument from their argument, which we will address later, that the 1945 Agreement did not avoid the usufruct limitation but actually created a usufruct subject to the 30-year limitation. For the purpose of our analysis of the absolute nullity argument, we characterize the 1945 Agreement as a sale of the standing timber and a lease of the land for a term of 99 years, with rights to cultivate and harvest timber but without a lease of the minerals.
Denkmann correctly cites LSA-C.C. art. 2030 for the proposition that a contract is absolutely null and may not be confirmed when it violates a "rule of public order, as when the object of a contract is illicit or *291 immoral." The same article provides that the absolute nullity of the contract may be pled by any party or noticed by the court. An absolutely null contract is "deemed never to have existed." LSA-C.C. art. 2033.
A lease of timberlands is not illegal per se unless the parties attempt to enter into a perpetual lease. See LSA-C.C. art. 2676, et seq., providing, in general, for the lease of things. Louisiana law requires that a lease be for a definite term, LSA-C.C. art. 2674, and it is well settled jurisprudentially that a perpetual lease is void as against public policy. G.I.'s Club of Slidell v. American Legion Post # 374, 504 So.2d 967, 970 (La.App. 1st Cir.1987), citing Bristo v. Christine Oil & Gas Co., 139 La. 312, 71 So. 521, 522 (1916). When no duration of the lease term has been specified in a lease of a predial estate, the law presumes that the term is for one year, enabling the farmer to make and harvest his crop. LSA-C.C. art. 2687. Nevertheless, the term and the conditions of leases, including predial leases, are generally regulated by contract, LSA-C.C. art. 2684, and leases for 99 years are valid at common law as well as civil law. State v. Board of Adm'rs of Tulane Education Fund, 125 La. 432, 51 So. 483, 491 (1910). However, the Louisiana civil law, unlike the French Civil Code, does not place a maximum duration of 99 years on the contract of lease. Yiannopoulos, 1 Civil Law of Property 277, n. 109. It is undisputed that the 1945 Agreement provides a definite term of 99 years, and it is not void as a perpetual lease.
The crux of plaintiffs' argument that the 1945 Agreement is contrary to public policy is that a long term lease takes the timberlands out of commerce. A similar challenge to a 99-year timberlands lease was rejected by the appellate court in McCain[9]v. Continental Can Co., Inc., 299 So.2d 454, 455-456 (La.App.2d Cir.), writ refused, 302 So.2d 308 (La.1974), quoting the trial court's reasons:
"As far as plaintiffs argue the leases take land out of commerce it would appear the tracts were put into commerce instead by placement in the hands of a lessee engaged in the timber business for the purposes stated and recited in the leases.... On this point, the Court is of the opinion the contracts speak for themselves and are valid in conformity with public (policy) and morals and laws."
Plaintiffs claim McCain is not on point because the court did not address the public policy embodied in the civil code's 30-year limitation of a usufruct granted to a corporation. Despite the fact that the parties in McCain did not raise the usufruct issue, the underlying public policy considered in McCain and the policy we consider are identical: the keeping of land in commerce. We acknowledge the legislature's intent to avoid the fragmentation of ownership that occurs when ownership is divided into usufruct and naked ownership for a long term or an indefinite term. When a usufruct is granted to a natural person, the usufruct expires at his or her death. The 30-year limitation on usufructs held by corporations serves the same purpose as the lifetime limitation for natural persons. However, the time limitation is unnecessary for leases. The law does not prohibit a lease to a corporation for a period in excess of 30 years because the lease does not result in fragmentation of ownership. Furthermore, the law does not prohibit corporations from choosing lease instead of usufruct, even if the choice is made solely to avoid the 30-year limitation. The parties have not confected an illegal contract because they sought to avoid the 30-year limitation on usufruct.
Nor was Denkmann's intent to retain the minerals beyond 10 years an "illicit or immoral" intent. The decision to lease the land instead of selling it was a business decision pure and simple. An example of a *292 similar decision is when a sole proprietor incorporates his business solely to "circumvent" the rule of law of personal liability; his decision is not contra bonos mores.
The validity of a 99-year lease of timberlands wherein the lessor retained mineral rights was recognized in McCain v. Continental Can Company, Inc., 299 So.2d at 458, as follows:
The [rent] money alone was not the only benefit received by lessor. Under Louisiana mineral laws he could not sell his lands outright and retain minerals perpetually without production. By use of the lease, lessor could and did retain his mineral ownership without burden of an obligation to produce within a limiting period. This would have to be viewed as an additional motivating factor in lessor's consenting to lease his surface rights for timber production.
Accordingly, we find no merit in plaintiffs' assertion that the 1945 Agreement is an absolute nullity. The discussion by the trial court about the public policies that formed the bases for the "design" of the 1945 Agreement merely provided background information. The trial court did not err in failing to declare the 1945 Agreement a nullity.

WAS THE AGREEMENT A USUFRUCT THAT EXPIRED IN 30 YEARS?
Having found that the 1945 Agreement was not a nullity, we must now consider whether the rights it created in favor of IP constituted a usufruct[10] which could not be granted for more than 30 years, LSA-C.C. art. 608 (formerly art. 612).
We must proceed to interpret the 1945 Agreement, for the purpose of characterizing it, as we would any other contract: we must look to the language of the contract in light of the statutory and jurisprudential provisions regarding contracts in general and regarding the object or objects of this contract in particular, keeping in mind the principle of freedom of contract that permeates the Louisiana Civil Code. See LSA-C.C. art. 2045, Comment (c).
The proper characterization of the 1945 Agreement depends, in part, upon the nature of the object of the contract. Some objects, such as oil and gas beneath the surface of the earth, are incapable of being owned,[11] and others are incapable of being leased. "All corporeal things are susceptible of being let out, movable as well as immovable, excepting those which can not be used without being destroyed by that very use." LSA-C.C. art. 2678.
The 1945 Agreement had several objects, one of which was the "future timber." On appeal, Denkmann argues that the trial court erred in characterizing the 1945 Agreement as embodying "the elements of sale and lease" where the parties "attempted to sell future growth for ninety-nine (99) years...."[12] However, Denkmann has referred to the 1945 Agreement as a "lease" in previous litigation with the Internal Revenue Service and in company memoranda introduced into evidence in the instant case. IP has described, and on appeal continues to describe, the 1945 Agreement as embodying "a sale of all timber growing and to grow on the property for 99 years."
We accept, for the sake of discussion, Denkmann's position that a sale of future timber is inconsistent with our civilian rules of ownership, and we exclude a sale of future timber from the list of possible characterizations of the 1945 Agreement. Nevertheless, we do not accept the proposition that we are left with the inescapable conclusion that the agreement established a usufruct in IP's favor.
Indeed, there is a compelling alternative: characterization of the 1945 Agreement as a "lease." This characterization is called for by the wording used by all parties' ancestors in title and their intent as evidenced by their business relations inter se for a period of 40 *293 years.[13] The instant case is unique in that the business relations of the parties established in the 1945 Agreement have been verified in the 1969 Agreement, the sole purpose of which was "to set forth the mutual interpretation of the parties to the provisions of the [October 25, 1945] contract."[14] The parties specified in the 1969 Agreement:
By an act of sale and lease dated October 25, 1945, Denkmann Lumber Company sold and conveyed to Southern Kraft Timberland Corporation certain timber, trees, wood and other forest products ... and entered into a contract for the use of said lands in the future during the life of the contract for the purposes set forth therein....[Emphasis supplied.]
It is clear that parties can enter into a contract of lease having as objects[15] timberlands to be used for growing trees and the right of the lessee to harvest the "fruits." Unlike standing timber that is an immovable capable of being owned and sold separately from the land, growing or "future" timber is classified legally as either a fruit of the land or a non-fruit (product). The "Comments" to LSA-C.C. art. 551 provide, in pertinent part, the following explanation:
Trees are born and reborn of the soil, but they are ordinarily considered to be capital assets rather than fruits on account of their slow growth and high value. See Harang v. Bowie Lumber Co., 145 La. 96, 81 So. 769 (1919). However, trees in a tree farm or in a regularly exploited forest may be regarded as fruits, because they are produced according to the destination of the property and without diminution of its substance. See Yiannopoulos, Personal Servitudes  27 (1968).
Because timber sales from a tree farm do not result in a diminution of the property, revenues derived from the sales are considered fruits. See Succession of Doll v. Doll, 593 So.2d 1239, 1248 (La.1992); LSA-C.C. arts. 550 and 551. Trees in a tree farm or forest are by nature a crop, such as sugar cane or cotton, rather than a product or a mineral. As our law contemplates the lease of land for crop farming (see LSA-C.C. art. 2687 providing for a term of one year for the farmer to make his crop on leased land when no term has been provided by the parties), a lease of land for tree farming was certainly among the contractual alternatives of the parties in the instant case.[16]
*294 This court has had numerous opportunities to apply the general principles of contract interpretation to a contract of lease. We have stated:
The courts are bound to give legal effect to all written contracts according to the true intent of the parties and this intent is to be determined by the words of the contract when these are clear, explicit and lead to no absurd consequences. La.C.C. arts. 1901 and 1945; Campesi v. Margaret Plantation, 417 So.2d 1265 (La.App. 1st Cir.1982), writ denied 422 So.2d 163 (La. 1982). This rule is applicable to contracts of lease. Brignac v. Boisdore, 272 So.2d 463 (La.App. 4th Cir.1973), affirmed 288 So.2d 31 (La.1973); Dikert v. Ruiz, 231 So.2d 633 (La.App. 4th Cir.1970). The meaning and intent of the parties to the written contract in such cases must be sought within the four corners of the instrument and cannot be explained or contradicted by parol evidence. La.C.C. art. 2276; Tauzin v. Claitor, 417 So.2d 1304 (La.App. 1st Cir.1982), writ denied 422 So.2d 423 (La.1982). In such a case, a person who signs a written instrument is presumed to know its contents and cannot avoid its obligations by contending ... that he did not understand it. [Citations omitted.] However, when the terms of a written contract are susceptible to more than one interpretation, or there is uncertainty or ambiguity as to its provisions, or the intent of the parties cannot be ascertained from the language employed, or fraud is alleged, parol evidence is admissible to clarify the ambiguity or show the intention of the parties or prove the fraud. La.C.C. arts. 1847 et seq.; Dixie Campers, Inc. v. Vesely Company, 398 So.2d 1087 (La.1981).
Hebert v. Neyrey, 432 So.2d 396, 398-399 (La.App. 1st Cir.1983), reversed in part on other grounds, 445 So.2d 1165 (La.1984).
We have previously quoted a portion of the 1945 Agreement dealing with the use of the land for the 99-year term by Southern Kraft and its successors. We note again the parties' choice of words: "[O]ne of the primary purposes ... is the right to use the said lands in the future ... for the purpose of growing timber ... which right ... is in the nature of a lease of the land ..., in addition to the purchase of the timber, wood and other forest products presently on said property." Other significant wording is: "The price and consideration for which this sale is made, and for which the lease and future operating and cutting privileges herein set out are granted, is as follows...." Also, "Subject to the terms hereof, the rights of the Vendee herein to cut and remove, and recut and remove, the said timber ... shall remain in full force and effect for a period of ninety-nine (99) years...." [Emphasis supplied for all of the quoted provisions.]
We find that the above language is indicative of the parties' intent to enter into a lease of the land with a grant to Southern Kraft of the right to operate a tree farm or timber operation thereon.
Despite the language of the 1945 Agreement and the conduct of the parties in relation thereto, Denkmann contends that because the 1945 Agreement conveyed to Southern Kraft the usus and fructus, or the right to use the property and enjoy the future fruits, it conveyed a usufruct. Denkmann is correct in stating that a "[u]sufruct is a real right of limited duration on the property of another," LSA-C.C. art. 535. However, a lease also conveys the use and enjoyment to the lessee. Denkmann has provided no authority that bars a lessor from investing the lessee with rights to the fruits. Explaining the nature of a lease, the Louisiana Supreme Court in Reagan v. Murphy, 235 La. 529, 105 So.2d 210, 214 (1958) quoted from In re Morgan R. & S.S. Co., 32 La.Ann. 371:
The rights of use, enjoyment, and disposal are said to be the three elements of property in things. They constitute the jura in re. The right of a lessee is not a real right, i.e., a jus in re. In other words, the lessee does not hold one of the elements [disposal] of property in the thing. His right is a jus ad rem, a right upon the thing.
Seeing no impediment to the characterization of the 1945 Agreement as a lease instead of a usufruct, and finding that such a characterization is indicated by the language of the written contracts and the conduct of the parties,[17] *295 we hold that the 1945 Agreement did not terminate within 30 years of its signing pursuant to LSA-C.C. art. 608.[18]

JNOV
IP appeals the trial court's judgment entering a partial JNOV awarding plaintiffs $2,056,905 in damages for interference with their mineral rights.
A JNOV should be granted only if the trial court, after considering the evidence in the light most favorable to the party opposed to the motion, finds it points so strongly and overwhelmingly in favor of the moving party that reasonable persons could not arrive at a contrary verdict. Anderson v. New Orleans Public Service, Inc., 583 So.2d 829 (La.1991); Belle Pass Terminal, Inc. v. John, Inc., 634 So.2d 466 (La.App. 1st Cir.), writ denied, 638 So.2d 1094 (La.1994). If there is evidence opposed to the motion which is of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motion should be denied. Anderson v. New Orleans Public Service, Inc., 583 So.2d at 832. In considering a motion for JNOV, the court should not weigh the evidence, pass on the credibility of the witnesses, or substitute its judgment of the facts for that of the jury. Belle Pass Terminal, Inc. v. John, Inc., 634 So.2d at 492. Furthermore, all reasonable inferences or factual questions should be resolved in favor of the non-moving party. Id.
The standard to be applied by the appellate courts in reviewing the grant or denial of a JNOV is whether the trial court's findings in rendering the JNOV were manifestly erroneous. Id. The review is done by using the aforementioned criteria just as the trial judge does in deciding whether to grant the motion or not, by determining whether the facts and inferences point so strongly and overwhelmingly in favor of the moving party that reasonable men could not arrive at a contrary verdict. Anderson v. New Orleans Public Service, Inc., 583 So.2d at 832.
Although the plaintiffs made two separate claims for damages with regard to interference with their mineral rights, the trial court granted the JNOV only for that portion of the plaintiffs' claim that involved the issuance of unauthorized geophysical (seismic) permits by IP for exploration on Denkmann lands. The trial court's partial JNOV and award of $2,056,905 are based upon the issuance of 56 seismic permits for explorations on lands that were not under a Denkmann mineral lease.[19] We pretermit, for the time being, plaintiffs' second claim: that they are entitled to damages because IP collected "excess compensation" from mineral companies for geophysical exploration, in breach of the 1945 Agreement.
Considering IP's challenge to the JNOV, we must decide: first, whether the trial court erred in determining that IP's actions constituted an interference, and, second, whether the trial court's assessment of damages was an abuse of discretion.

Interference with mineral interests:
Louisiana recognizes a mineral owner's right to explore geophysically for minerals. A mineral owner's right to be compensated for unauthorized geophysical exploration was explained by the Louisiana Supreme Court in Layne Louisiana Co. v. Superior Oil Co., 209 La. 1014, 26 So.2d 20, 22 (1946), wherein the court stated:
It is a well-known and accepted fact in this, the third largest producing oil State, that the right to geophysically explore land *296 for oil, gas or other minerals is a valuable right. Large sums of money are annually paid landowners for the mere right to go upon their land and make geophysical and seismograph tests. The information obtained as the result of such tests is highly valuable to the person or corporation by whom they are made. If the information thus obtained be favorable, it can be used and is used in dealing with the landowner for his valuable mineral rights. If the information be unfavorable, the fact quickly becomes publicly known and thus impairs the power of the landowner to deal advantageously with his valuable mineral rights. The average landowner is without means or funds to secure geophysical or seismograph information. Where that information, which is exclusively his by virtue of his ownership of the land, is unlawfully obtained by others, the landowner is clearly entitled to recover compensatory damages for the disregard of his property rights.
In the instant case, the rights of Denkmann to the minerals and of IP to the timberlands are delineated in the 1945 Agreement. The 1945 Agreement makes the mineral rights and interests reserved by the owners paramount to the rights and interests of the timberlands lessee, which are expressly subordinated to the owners' mineral rights. The 1945 Agreement further provides for compensation to the lessee for "loss or damage resulting from such operations [mineral development] by Vendor."[20] Despite their paramount rights, it was not until the early 1970s that Denkmann began active development of its mineral interests through mineral leases and resulting development and production, including geophysical exploration on the land leased to IP.[21] Initially, when geophysical exploration work was completed, IP would send a forester to assess the damages to its holdings, and Denkmann would compensate IP according to the losses it had sustained.
Eventually, it was agreed between Denkmann and IP that IP would seek its damages directly from the geophysical exploration companies that were performing the work, instead of from Denkmann. At this point IP decided that the expense involved in sending foresters to assess damages was too burdensome; *297 thereafter, it chose to be compensated for damages to its timber holdings by the shot hole method, receiving anywhere from $50.00 to $150.00 per shot hole. This decision prompted IP's practice of requiring seismic companies to apply for a "permit" in order to conduct their seismic work. From 1975 until 1989, IP, through its mineral agent, General Crude Operating (GCO), issued many permits on the Denkmann lands for seismic exploration, and it is undisputed that 252 of these permits were issued without the knowledge of Denkmann or without a corresponding permit from Denkmann as mineral owner.
GCO, a wholly owned subsidiary of IP, managed all aspects of geophysical explorations for IP during the years pertinent to this litigation. Mrs. Katherine Peck, GCO's seismic permit coordinator from 1981 until 1986, testified that companies wishing to perform seismic work on lands leased by IP were required to pay a $500.00 permit processing fee as well as up-front shot hole fees based upon the number of holes the company planned to shoot. Mrs. Peck, who was responsible for processing all seismic requests, would research IP's interest in the lands requested and thereafter issue the appropriate permit. However, prior to issuing a permit, she did not verify whether Denkmann had issued a permit, nor did she direct seismic companies to contact Denkmann.
The permits issued by GCO stated that the permittee was "granted non-exclusive permission to use the surface of the following described land located in the Parish of ____, State of Louisiana to conduct a seismic survey." The permit thereafter listed the property covered by the permit and stated that the permit was granted upon specified terms and conditions. The terms and conditions of one type of GCO permit contained the following pertinent language:
(3) Prior to commencing operations under this permit you must secure permission from all other necessary parties, including Mobil Exploration, mineral lessee of the above described land(s).
. . . . .
(5) This permit is granted with the express understanding that it is subordinate to any other outstanding commitments that may conflict herewith, and this permit in no way represents a warranty of ownership of the above described land or mineral rights therein.[22] This permit should not be transferred or assigned in whole or in part without the prior written consent of the undersigned.
(6) You agree that not later than thirty (30) days after the completion of your work under this permit, you will furnish GCO Minerals Company at P.O. Box 4258, Houston, Texas 77210, two (2) maps showing all shot point locations and vibroseis lines made by you under this permit with driller's logs on each shot point drilled which shall include depth of overburden, sand, gravel, clay and lignite.
(7) Promptly upon the completion of operations hereunder you agree to pay this company for all shot points drilled on the above described lands at the rate of $100.00 per shot hole for conventional seismograph surveys, or $600.00 per mile for "minihole" seismic programs. When Vibroseis[23] equipment is used under this permit you will pay this company $400.00 per mile. Such payments shall be the minimum fee for use of the surface and mineral estates. In the event excessive damage to the surface or mineral estate is caused by the permitted activity GCO Minerals Company will notify you of all additional fees required to be paid. Payment should be made by ONE check covering the total charges under this permit and should not include payment for any other permit.
Mrs. Peck explained that she used basically the same seismic permit form for companies conducting work on IP's leased lands as she did for those conducting work on IP's fee *298 lands. The only difference was a reference to Mobil Oil as the mineral lessee on IP's fee lands.[24] She further explained that often one permit would be used for lands which encompassed both IP fee lands[25] and leased lands.
Thus, the crucial question with regard to the plaintiffs' claim that IP allowed geophysical exploration not authorized by Denkmann is whether the permits issued by IP were "unauthorized seismic permits" or whether they were, as IP claims, nothing more than "damage releases" that included compensation to IP for damage to the surface of the timberlands, pursuant to the 1945 Agreement. The trial court in granting the JNOV concluded that the permits issued by IP were not merely release forms for damages but were unauthorized seismic permits. The jury was not presented with a question asking its determination of this threshold fact, but was asked only the general question seeking a determination of the ultimate fact of mineral interference. We believe that the finding by the trial court is the only reasonable conclusion supported by the evidence for two reasons: first, the nature of the permit; second, IP's awareness of the plaintiffs' paramount mineral interests.
IP argues that the permits were merely "surface permits" and not "seismic permits." The very language of the permits belies IP's contention that they were not seismic permits. First, the permits required the payment of shot hole fees, a method of payment normally used to compensate mineral lessees or mineral owners for the right to explore their minerals.[26] Second, the permits requested seismic information, a right normally reserved to the mineral owner or mineral lessee granting a seismic permit.[27] Third, apparently as many as 15 of GCO's permits made reference to IP's mineral ownership, stating that mineral interests were being permitted. Fourth, check stubs for payments received for the permits stated that the property was owned by IP or GCO.
IP also contends that because its permit was conditioned upon the seismic company obtaining permission from "all other necessary parties," the permit was not a seismic permit without that permission. The point missed by IP in this argument is that it had no right to grant a permit at all, not even one with limiting language. A seismic permit can be granted only by the mineral owner or a mineral lessee and grants only a limited right to explore by the seismic method. See Layne Louisiana Co. v. Superior Oil Co., 26 So.2d at 22. IP, as the surface lessee, had no right to grant seismic permits.
The testimony of Mrs. Peck concerning the handling of seismic permit requests also runs counter to IP's argument. GCO received request letters from seismic companies wishing to conduct seismic work on the leased land. Some of the request letters addressed to GCO indicated that GCO was the surface and mineral owner and further requested that "[i]f this ownership information is incorrect please correct it on this permit." Mrs. Peck explained that when she received such a request indicating the seismic company's belief that GCO owned the minerals, she conducted her own research. However, she did not give any indication to the company, one way or the other, of what minerals IP actually owned. Although she stated that she may have corrected the misunderstanding in a telephone conversation, there was *299 nothing in her files indicating a correction of the seismic company's misunderstanding.
We conclude the nature of the permits fails to support IP's contention that the permits were not seismic permits.
Consistent with our conclusion concerning the nature of the permit is our further conclusion that GCO clearly understood the limited nature of IP's rights and the paramount nature of Denkmann's rights with regard to the issuance of seismic permits on the property owned by Denkmann. GCO's understanding is evidenced by an internal communication from Hugh Rives, GCO's mineral department director, to Jim Montague, dated February 4, 1986, discussing GCO's treatment of seismic permits after the transfer of lands to IPTO from IP, with IP reserving mineral rights. The letter stated in pertinent part:
IPCo as the mineral owner has a common law right to make reasonable use of the surface to explore for and develop its mineral estate. That right is limited by the contractual obligations in Exhibit "C"[28] to the conveyance from IPCo to IPTO. IPT, Ltd. and/or IPTO have no right to authorize any exploration for nor development of the minerals. Exploration of minerals owned by IPCo without a valid permit from IPCo would constitute a mineral trespass by the party conducting the seismic activity. IPTO as a surface owner cannot grant a valid permit to conduct seismic surveys on minerals which underlay its lands, nor may it prohibit such activity by the mineral owner.
. . . . .
The genesis of the right to charge for shot hole fees is mineral ownership. Surface ownership does not entitle the surface owner to recover from the mineral owner for the mineral owner's reasonable use of the surface. The mineral owner, however, has the right to limit or prohibit mineral exploration on those lands ... While payment of surface damages to surface owner having no mineral estate may occur, the seismic company operating under a permit from a mineral owner has no legal obligation to pay, but does so to retain good public relations. (Emphasis added.)
Further evidence that IP was aware of its obligations with regard to the issuance of seismic permits on Denkmann lands is the following correspondence, dated October 2, 1979, from Mr. Larry J. Swofford, the IP timberlands supervisor, to Mr. J.R. Ward, the IP regional manager. The letter states:
It appears that someone should review procedures for issuing exploration permits on Denkmann lease lands.
During a recent conversation with Rudy Ewing, agent for Lanat and Denmiss, Rudy made a comment about exploration permits, asking who issued ours. I told him GCO issued permits for IP property. He stated GCO should not be issuing permits for property under the long term lease. I told him GCO issued permits on fee property, then I changed the subject without further comment.
A review of our permit files shows GCO and their predecessor have issued many exploration permits on Denkmann lands. In paragraph 3 the permit does recognize "other outstanding commitments".
It appears to me that these permits could be construed by Denkmann interest as conflicting with the terms of the original lease. I realize our surface interest should be, and are, protected by the present permit system. However, I question our authority to require the permittee furnish all the information required in paragraph 5 of the permit.

*300 I recommend the implications of the present permit system be reviewed by legal personnel. Recommendations for further action should be based on legal opinion.
IP's knowledge of the relative rights of the parties to grant seismic permits is neither erased nor excused by any alleged knowledge on Denkmann's part concerning the seismic permits that formed a basis for the damages awarded by the trial court upon rendering a JNOV. We find no merit in IP's argument that the fact Denkmann had copies of five to 10 GCO seismic permits in its files indicates that Denkmann approved or agreed to the issuance of these permits. Both Mr. Bruce Monroe and Mr. James McCuistion, Denkmann's mineral agent, testified that they were not aware of the GCO permits that were found in their files. Neither IP nor GCO sent the permits to Denkmann, so it must be assumed that they were sent by Denkmann's mineral lessees in connection with seismic work being conducted on leased property. These transactions would hold little interest for Denkmann or its mineral agent because the property was already under a mineral lease and Denkmann would receive nothing for this seismic work. Furthermore, we do not believe that the existence of five permits in the Denkmann files with reference to seismic work conducted on lands that were under mineral lease would alert Denkmann that IP was issuing permits without its consent.
Accordingly, we conclude that the permit practices adopted by IP clearly show IP made no distinction between the permits it issued on its own lands and those it issued for lands owned by Denkmann.[29] Because of the paramount mineral rights retained by Denkmann in the 1945 Agreement, IP's permission was not necessary in order for geophysical companies to enter the land and conduct their work. IP had only the right to collect damages for losses caused by mineral development. IP's use of "permits" to effect pre-payment of damages was in contravention of the 1945 Agreement.
Amount of damages for unauthorized seismic exploration:
Denkmann bases its claim that it was damaged by the unauthorized seismic work on the fact that it was deprived of the opportunity to procure mineral leases on the land.
Historically, the plaintiffs allowed seismic exploration only upon lands that were under mineral lease. Numerous witnesses testified concerning this policy.[30] It was explained that a mineral lease is the preferred method of developing minerals because the mineral owner (lessor) is given a per-acre mineral bonus at the inception of the lease as compensation for the first year of the lease. Mineral leases are generally of short duration and can, at the option of the lessee, be renewed yearly for the duration of the lease at a yearly rental normally calculated on a per-acre basis. In addition to the bonus or rental, the mineral lessor retains a fraction of the production of a well, or royalty. Under a mineral lease, the lessee is granted the right to explore and develop minerals either by seismic exploration or drilling operations without obtaining further permission from the mineral owners. However, in circumstances such as the instant case where the surface of the land is leased to a third party, the mineral lease is made subject to the surface lease, and the mineral lessee normally compensates the surface lessee for damages caused to the surface.
Denkmann measured its damages for the issuance of the unauthorized permits by calculating the lost opportunity to contract mineral leases on the property where the unauthorized explorations occurred. This method of damage assessment was also used in Layne, wherein the employees of the defendant, without permission to do so, conducted a complete survey of the plaintiff's land at *301 the defendant's direction, apparently for use in connection with geophysical explorations it was making in its neighboring lease block. In affirming the trial court's award of $5.00 per acre as a fair lease value for each acre of land owned by the plaintiff, the supreme court in Layne noted the following evidence:
The evidence shows that plaintiff's property was a likely oil prospect prior to the geophysical exploration conducted thereon by the defendant. Six months elapsed from the time the geophysical exploration was made and the trial of the case. During that time no leases were entered into and defendant, influenced no doubt by the information it had obtained from the geophysical survey of plaintiff's land, gave up its own lease block. The testimony in the record shows that prior to the geophysical exploration of defendant's land leases in that vicinity were worth not less than $5 an acre. Defendant itself paid $5 per acre for the privilege of shooting certain acreage within its own lease block. It is true that the tracts were small and that generally the price for shooting privileges was fifty cents to a dollar per acre. In view, however, of the importance defendant apparently attached to the information it was seeking by the geophysical survey of plaintiff's property, and since defendant had paid $5 per acre for the privilege of shooting certain acreage within its own lease block, we are unable to hold that the judge erred in fixing a value of $5 per acre....
26 So.2d at 22.
It is well settled in Louisiana that damages should be awarded for illegal trespass on one's property, even when committed in good faith and also when proof of actual damages is uncertain. Id.; Wendorf v. Corley, 394 So.2d 1252 (La.App. 3rd Cir.1980). When damages are insusceptible of precise measurement, much discretion shall be left to the court for the reasonable assessment of damages. LSA-C.C. art. 1999.
In the instant case the trial court relied on the testimony of Mr. Bill Hise, plaintiffs' expert in oil and gas land management, for an assessment of the damages sustained by Denkmann because of the unauthorized seismic permits. Mr. Hise compiled a summary of mineral leases executed by Denkmann from 1970, until 1989, and a summary of the seismic permits issued by IP from 1975 until 1989. After comparing the summaries, he determined that 56 of the issued seismic permits involved 26,048 acres of land that Denkmann did not have under mineral lease. In his opinion the permits allowed by IP hindered Denkmann's ability to lease the land. Mr. Leon Comeaux, an expert in petroleum geology, also testified that seismic information can be critical information and can cause the loss of a prospective mineral lessee when the property is permitted for seismic work before there is an opportunity to negotiate a lease.[31]
In assessing the damages sustained by Denkmann from the unauthorized seismic explorations, Mr. Hise calculated the average bonus rates for mineral leases from 1978 to 1987 as follows:

1978-1980 $10.00 per acre
1980-1981 $50.00 per acre
1981-1983 $100.00 per acre
1983-1987 $150.00 per acre

Based on these average bonus rates, Mr. Hise determined that the loss of potential mineral lease income to Denkmann was $2,056,905. He explained that his calculations were based only on lost bonus rates without consideration of rental renewals after the first year of the lease. He stated that in reality there are many instances where the mineral lease will be renewed. Mr. Hise did not take into consideration whether the seismic information received was good or bad, or whether the information was disseminated to third parties. Mr. Hise further explained that the $2,056,905, in his opinion, was a conservative estimate, as the calculations did not include any of the lands encompassed in the 56 permits that were leased within one year following the seismic activity.
We find unpersuasive the testimony of IP's expert, Mr. Larry E. Temple, with regard to the calculation of Denkmann's lost mineral *302 income. Mr. Temple testified that 11 additional mineral leases were contracted on lands covered by the 56 unauthorized permits more than one year from the date of the permit, but before the time of trial. Mr. Temple believed that the amounts Denkmann received from these 11 leases should be deducted from Mr. Hise's calculations because Denkmann's ability to lease the land negated Denkmann's claim to damages from the unauthorized seismic permitting. We find this argument untenable because we cannot assume that Denkmann would not have leased the lands prior to the leases referred to by Mr. Temple.
We conclude that the trial court did not abuse its discretion in basing the amount awarded in damages in its partial JNOV on the plaintiffs' expert's calculations of lost lease monies.

DENIAL OF AWARD FOR "EXCESS COMPENSATION"
Denkmann claims that the trial court erred in failing to make an additional award to compensate for the monies received by IP for all of the unauthorized permits.[32] Mr. Leon Comeaux testified that IP received a total of $485,983.12 for 252 unauthorized permits. He explained that $69,700.00 was administrative fees for processing the permits and $416,283.12 was compensation for shot hole fees. Mr. Comeaux also testified that IP received a total of $46,347.00 more than the value of the standing timber on nine Denkmann mineral development sites. Denkmann contends that because IP was not entitled to these fees under the 1945 Agreement, the trial court should have awarded this amount to Denkmann as part of the damages for interference with its mineral rights. Denkmann reasons that because the trial court concluded that IP was entitled to collect only for its "present timber losses" on lands where mineral exploration was conducted, the court should have awarded the permit fees to Denkmann.
It is clear that IP was entitled to some type of surface damages for losses it sustained during seismic exploration and mineral development. We believe that when Denkmann agreed to allow IP to negotiate its surface damages with the geophysical companies, IP was free to negotiate any amount that would not inhibit the mineral production on the Denkmann land. The evidence does not reveal that the fees collected by IP were so exorbitant as to inhibit mineral exploration. The evidence also established that Denkmann was aware of IP's practice of recovering directly from the geophysical companies. Under these circumstances, we find the trial court's refusal to award these fees to Denkmann was not erroneous.
Alternatively, Denkmann argues that IP was unjustly enriched by the compensation it received for the unauthorized permits.
To recover under the theory of unjust enrichment, a plaintiff must show: enrichment on the part of defendant; impoverishment on the part of the plaintiff; a causal relationship between the enrichment and the impoverishment; an absence of justification or cause for the enrichment or the impoverishment, and the lack of another remedy at law. Edwards v. Conforto, 636 So.2d 901, 907 (La.1994), on rehearing.
We do not believe that the theory of unjust enrichment applies under the circumstances of this case because Denkmann was not impoverished by the payments IP received for the unauthorized seismic permits. For the permits issued on lands that Denkmann already had under mineral lease, Denkmann was not entitled to seismic fees because the mineral lease encompassed all seismic exploration. Mr. Comeaux admitted in his testimony that the issuance of these permits did not affect Denkmann's income. For the permits issued on unleased land, Denkmann was not entitled to the permit fees because the trial court already compensated Denkmann through its award of $2,056,905, calculated on the lost opportunity to obtain mineral leases on the property.
Accordingly, there is no merit to Denkmann's claim for additional damages commensurate with the fees received by IP for *303 seismic permits or mineral development damages.

DAMAGES FOR SURFACE LEASING
Following the rendition of the 1992 judgment, IP filed a motion to have the judgment conformed to the jury verdict. On appeal, IP urges that the trial court erred in failing to grant the motion, because the judgment awarded damages of $100,000 for a claim the jury determined had prescribed. We conclude that the trial judge committed reversible error when he rendered judgment contrary to the jury's response that the claim was prescribed.
Faced with five breaches of the 1945 Agreement alleged by the plaintiffs, the jury decided that the defendants had breached only one: the duty owed to the plaintiffs under the contract regarding surface leasing. The jury also responded that the Denkmann corporations, but not the mineral distributees, were entitled to damages in the amount of $100,000 for the breach. However, the jury responded, in the very next question, that the Denkmann corporations knew or should have known of their damage by surface leasing prior to 1975. (See Appendix.)
Despite the jury's decision that the claim for wrongful surface leasing had prescribed, the trial court entered judgment in Denkmann's favor for $100,000. The trial court pointed to a surface sub-lease to Callon Petroleum Oil Company as justification for its award of damages, noting that the lease was not entered into until after 1975, and that any claim arising from that lease could not have prescribed.
Although IP contends the trial court's 1992 judgment was contrary to LSA-C.C.P. art. 1916(2), we find that the following pertinent provisions of LSA-C.C.P. art. 1813 are applicable to the instant situation:
A. The court may submit to the jury, together with appropriate forms for a general verdict, written interrogatories upon one or more issues of fact the decision of which is necessary to a verdict. The court shall give such explanation or instruction as may be necessary to enable the jury both to make answers to the interrogatories and to render a general verdict, and the court shall direct the jury both to make written answers and to render a general verdict.
* * * * * *
C. When the general verdict and the answers are harmonious, the court shall direct the entry of the appropriate judgment upon the verdict and answers.
D. When the answers are consistent with each other but one or more is inconsistent with the general verdict, the court may direct the entry of judgment in accordance with the answers, notwithstanding the general verdict, or may return the jury for further consideration of its answers and verdict, or may order a new trial.
E. When the answers are inconsistent with each other and one or more is likewise inconsistent with the general verdict, the court shall not direct the entry of judgment but may return the jury for further consideration of its answers or may order a new trial.
Applying Article 1813, this court has held that when a trial court directs a jury to make answers to interrogatories and to render a general verdict, and the answers and verdict are inconsistent, the trial court has three options: to direct entry of judgment in accordance with the answers, notwithstanding the general verdict; to order a new trial, or to return the jury for further consideration of its answers and its verdict. The choice of which option to exercise is a matter within the sound discretion of the court. House v. Thompson, 452 So.2d 1195 (La.App. 1st Cir.), writ denied, 457 So.2d 15 (La.1984). Under the statute and House, the trial court has the authority to render judgment in accordance with the specific interrogatories, but lacks the authority to render judgment in accordance with the general verdict when the two are in conflict. Furthermore, in House, this court held that a trial court's interrogatory asking what amount a plaintiff in a personal injury suit should receive in damages was tantamount to a general verdict.
We hold that pursuant to LSA-C.C.P. art. 1813 and our holding in House, *304 the jury's finding of breach by surface leasing and the award of $100,000 for the breach were tantamount to a general verdict. When we regard the jury's answers to those questions as a verdict in plaintiffs' favor for $100,000, then the jury's answer to the specific interrogatory regarding prescription is inconsistent with the general verdict. Although the trial court apparently concluded the responses were inconsistent, the trial judge granted a verdict in conformity with the general verdict, which was not one of the three options provided to him in Article 1813. In so doing, the trial court committed reversible error. Accordingly, we vacate the trial court's judgment awarding $100,000 for surface leasing.
Having vacated the judgment, we are left with the jury's responses to the specific interrogatories. Our review of the record convinces us that the jury was presented with interrogatories that were impossible to answer accurately in light of the evidence of record. The jury was asked if the Denkmann corporations knew or should have known prior to December 19, 1975, of the damage they incurred because of surface leasing. However, the evidence presented to the jury encompassed some surface leases granted by IP that bore dates prior to 1975 and some surface leases granted by IP that bore dates subsequent to 1975. A question allowing the jury to specify which surface leases formed the bases for their answers regarding the breach of the 1945 Agreement and the corporations' knowledge of the breach was needed to provide the jury with a mechanism for conveying its decision.
We find that the trial court committed reversible error in propounding interrogatories to the jury that make it impossible to determine from the answers exactly what the jury intended. See Crochet v. Maryland Cas. Ins. Co., 401 So.2d 439 (La.App. 1st Cir.), writ denied, 406 So.2d 626 (La.1981). The legal error interdicted the jury's decision with regard to surface leases.
As an appellate court we now have the option of remanding the case for a new trial or deciding the case on the record. As we previously mentioned, trial on the merits lasted for several months, and the record is complete. Considering the record and the jurisprudence, we have, in reality, no choice but to decide the issue. Gonzales v. Xerox Corporation, 320 So.2d 163 (La.1975).
The purpose of the 1969 Agreement, by its own terms, was to "confirm" the provisions of the 1945 Agreement. However, the parties included in the 1969 Agreement some specific language concerning surface leases. According to the 1969 Agreement, IP had the authority to enter into surface leases under the following conditions:
(1) The contract of October 25, 1945, vests International Paper Company with the right to grant surface leases to various persons to portions of the property for the purpose of grazing cattle and general agricultural purposes and to prevent the accrual of squatters' rights or other adverse occupance by third persons in accordance with usual and customary practices in the forest products industry with respect to use of lands by landowners.
(2) International Paper Company has the right to grant leases for recreation purposes, including, but not limited to, hunting and fishing on these lands with or without a tangible consideration for such rights in accordance with practices prevailing in the forest products industry for multiple use of forest lands....
The surface leases entered into by IP fall into several categories: agricultural, grazing, recreational, prevention of squatters' rights, and mineral development. The 1969 Agreement grants IP the authority to enter into the leases enumerated in the first three categories, and the trial testimony concerning those leases shows no significant breach of the 1945 Agreement. Furthermore, the amount of land subject to those leases was not substantial. According to the testimony of Mr. Raymond Edmonds, III, Denkmann's forestry expert, the leases since 1945 involve only 199.4 acres per year, equaling .002% of the total property. Mr. Edmonds admitted that the amount is inconsequential. We find that the agricultural, recreational and grazing *305 leases do not support Denkmann's claim of breach by unauthorized surface leasing.
Denkmann also claims that the repetitive use of rent contracts or leases for the prevention of squatters' rights is contrary to good forestry practices and, therefore, constitutes a breach of the 1945 Agreement. We find no merit to Denkmann's assertion for the reasons expressed in our later discussion of encroachments.
The remaining category, surface leases for mineral development, encompasses a 25-year sub-lease to Callon Petroleum for the site of a tank battery to store oil produced by Callon from the Lockhart Crossing Field. Denkmann was participating in the production of this field pursuant to a mineral lease with Callon signed in 1982, although the wells were not actually on Denkmann lands.[33] When difficulties arose with transporting the oil from the field, Callon approached Denkmann concerning the construction of a tank battery on a portion of property under the mineral lease. Callon's land manager, Charles Goodson, contacted Denkmann's mineral agent Jim McCuistion concerning the tank battery. He directed Mr. Goodson to contact IP concerning a surface lease, and Denkmann would be happy to ratify it. Mr. Goodson's testimony is corroborated by telephone memoranda discovered in Mr. McCuistion's files. Mr. Goodson further testified that he stayed in regular communication with Mr. McCuistion about the operations. Negotiations with IP were conducted by another Callon representative, Greg Champion, who believed that Callon had Denkmann's approval.
Neither the 1945 nor the 1969 Agreements specifically addresses surface leases related to mineral development. However, we believe that the Callon lease not only was entered into with Denkmann's approval but it facilitated mineral production by Denkmann's own mineral lessee. Denkmann cannot now claim a breach of the 1945 Agreement because it did not approve the specifics of the lease agreement. Additionally, we note that the terms of sub-lease are specifically contingent upon the 1945 Agreement with Denkmann; the term of the lease is within the lease period granted under the 1945 Agreement, and the provisions of the lease require the removal of all equipment from the tank battery facility at the termination of the sub-lease. These facts, together with the realization that IP is required to purchase the lands pursuant to the option agreement, lead us to the conclusion that Denkmann has failed to carry its burden of proof with regard to its claim for damages from the Callon sub-lease.

ENCROACHMENTS
Denkmann further contends that the trial court erred in failing to grant a JNOV awarding damages in the amount of $2,143,500 for IP's breach of its duty to prevent encroachments on the Denkmann lands and to compensate Denkmann for the cost of a remedial survey to reestablish the boundaries of the Denkmann lands. When a JNOV is denied by the trial court, the appellate court must simply review the record to determine whether there was legal error or whether the trier of fact committed manifest error. Autin's Cajun Joint Venture v. Kroger Company, 637 So.2d 538 (La.App. 1st Cir.), writ denied, 638 So.2d 224 (La.1994).
Denkmann contends that IP was required by LSA-C.C. art. 2724 to prevent encroachments on the Denkmann lands and to provide Denkmann with notice of any encroachments. Louisiana Civil Code Article 2724 provides that "[i]t is the duty of a farmer of a predial estate, to prevent the same being encroached upon, and in case of such encroachment, to give notice to the proprietor, in defect of which he shall be liable in damages."
Furthermore, Denkmann argues that these obligations also were imposed upon IP under the 1945 Agreement pursuant to the "good forestry practices" clause. Denkmann's expert testified at trial that there were 425 instances of encroachment covering 829 acres, with a diminution in value to the lands *306 of $1,243,500. However, it is important to note that these figures include many acres of land which were under rent contracts with IP. Denkmann included these lands in its assessment of encroachments because it believes that the practice of giving rent notes to prevent the running of prescription is contrary to good forestry practices.[34]
The testimony of Mr. Robert Nonemacher, IP's division forester in 1946, reveals that he and Mr. Haley Giles, Denkmann's representative, worked harmoniously together regarding trespasses, encroachments, trash disposal, powerline or gas transmission line requests, and taxes. He stated that he kept Mr. Giles informed of encroachments on the property. He further stated that he never received any objections from Denkmann on how IP was handling the encroachments, nor did Denkmann express any interest in participating in the handling of those matters.
Numerous communications between IP and Denkmann regarding encroachments were entered into evidence to show the dealings with Denkmann concerning IP's handling of encroachments. For example, there is a letter from Bob Graves, Denkmann's attorney, dealing with an alleged encroachment in St. Helena Parish that Denkmann previously had asked IP to refrain from pursuing; a letter from Mr. Graves dealing with an encroachment by a church; and exhibits involving a dispute that Denkmann agreed to refrain from pursuing and requested that IP do the same.
Mr. Charles Bergin, IP's unit supervisor for the leased lands in Louisiana, testified that during his tenure as unit supervisor, IP's policy with regard to encroachments was to notify Denkmann only when the encroachment involved a situation that IP could not resolve. He stated that he would call Mr. Bob Graves, Denkmann's attorney, on a regular basis to discuss matters concerning the leased lands. He explained that rent contracts were used in many situations to prevent the removal of a church or residence that had been built over the property line. In situations where people were living on the property at the time the lease was made, he allowed them to continue there until death, and then he would not renew the rent contract.
Mr. Bergin testified that a survey of the boundary line disputes present in 1945 was made based upon aerial photographs. According to the survey, IP recovered approximately 10,000 acres since 1945, most of which have been reforested.[35] Although more encroachments arose after the 1945 Agreement, at the time of trial, only 10, involving 50 acres, were unresolved. Furthermore, it is undisputed that after the signing of the 1945 Agreement, Denkmann quit-claimed some of the acreage involved in alleged encroachments by third parties.
The trial court made the following findings in regard to encroachments:
The evidence was clear that these lands continually suffered from minor encroachments, from the times before the 1945 Agreement and thereafter. When the Defendant began its use of these lands in 1945, it succeeded to the Plaintiffs' numerous rent contracts which the Plaintiffs had entered into with various third parties in Plaintiffs' attempts to control the continuous minor encroachment problems.
The factual setting of this problem on the boundaries of 95,000 acres of non-contiguous lands in east-central Louisiana shows the great difficulties which the Defendant, and before it, the Plaintiffs had with these minor encroachments. The Plaintiffs' lands contain many hundreds of *307 miles of boundaries, most of which had never been extensively surveyed by either party. Boundaries were often to [sic] ill-defined for litigation, and the cost of such legal eviction was prohibitive as compared to the relatively minor encroachment found. Defendant's personnel testified before the Jury extensively about their boundary marking and maintaining procedures.
Given the standards under both the Motion for New Trial and J.N.O.V., which the Movers must meet, this Court finds that with respect to the issue of encroachment, the Movers have failed to meet its burden of proof....
Not only do we agree with the trial court that the jury's decision regarding encroachments should not be disturbed, but we also find there is no merit to Denkmann's claim on appeal to additional damages for the cost of a remedial survey to establish boundary lines. Mr. Charles Bergin and other IP employees explained that there are 765 miles of boundary lines and that IP attempted to blaze approximately 150 miles per year, which would keep their boundary lines on a five-to-eight year cycle. The evidence established that a five-to-eight year boundary marking cycle was within acceptable good forestry practices. Consequently, we find no manifest error in the trial court's refusal to grant a JNOV on this issue.
An additional reason not articulated by the trial court for rejection of Denkmann's claim is the option to purchase. The record in the instant case reveals that IP exercised its option to purchase the timberlands on August 3, 1990. The option clause in the 1945 Agreement states that the lessee shall have the option to purchase "all of said lands" that were being leased in 1945. By its exercise of the option to purchase, IP became obligated to purchase the acreage that Denkmann owned in 1945, less and except the acreage quit-claimed by Denkmann, regardless of later encroachments. Although the instant lawsuit is not the proper forum for the determination of the price IP will pay to Denkmann for the lands it will purchase, IP will be foreclosed from claiming a reduced price because acreage was lost by encroachments IP allowed to occur.[36] Denkmann's claim that it was damaged by the encroachments is without merit because the plaintiffs will suffer no loss when IP pays for all acreage that was part of the 1945 Agreement. IP's exercise of the option makes Denkmann's issues regarding encroachment moot.[37]

WASTE SITES
Similar to its claim for damages for encroachments is Denkmann's claim that the trial court erred in failing to make an award of $10,000,000 for IP's action in allowing waste sites to be established on Denkmann lands.[38] The trial court declined to disturb the jury's decision that IP did not breach the contract by allowing waste sites, but the judge did not specifically address the issue. Our review of the evidence convinces us that the trial court did not err in refusing to grant a JNOV on Denkmann's waste site/promiscuous dumping claim. Nor are we convinced that the jury committed manifest error in failing to find that IP wrongfully granted waste site permits or wrongfully allowed promiscuous dumping.
*308 Mr. Bergin, IP's unit supervisor, explained that there are hundreds of miles of public roads throughout the leased lands and that IP manages 165 miles of private roads. The roads gave access for public dumping throughout the properties. Because there was no curb-side pickup of garbage in four of the five parishes where the Denkmann lands are located, the problem of indiscriminate dumping was acute. IP worked continually with the parishes to control the problem by cleaning up road-side dump sites, putting gates across roads, and grading roads to prohibit access. However, the efforts were constantly thwarted by the public.
In 1966, IP sought and received Denkmann's approval to contract with various police juries to lease portions of the property for the placement of trash disposal sites to be operated and maintained by the parish police juries (parish governing bodies). By letter dated June 9, 1966, Mr. Robert Nonnemacher requested Denkmann's written approval to lease suitable locations to the police juries in the Florida Parishes for "trash disposal purposes," attaching a copy of a proposed lease to St. Helena Parish. By letter dated December 12, 1966, IP received Denkmann's approval. Mr. Monroe, Denkmann's CEO, testified at trial and admitted that Denkmann did not object to its properties being used as trash disposal sites and that the written consent of the agents and attorneys-in-fact was to the establishment of trash disposal sites in all of the parishes in which the leased lands were located, not limited to St. Helena Parish.
Although IP monitored the sites, it relied primarily on parish and state inspections conducted by the Department of Natural Resources. In the early 1980's, the sites were closed in accordance with all Department of Environmental Quality and Environmental Protection Agency regulations.
Denkmann argues on appeal that IP permitted 21 sites, instead of 10 as indicated in its original letter requesting approval. Denkmann further avers that IP allowed the dumping of "waste," including some medical and hazardous waste, instead of mere trash; failed to fence in the sites; and failed to "maintain" the sites by monitoring them. Additionally, Denkmann complains that the permitting of trash sites did not prevent dumping in other areas, and that by the early 1980s, there were over 30 non-permitted, promiscuous dump sites.
There is no merit to Denkmann's arguments. We are convinced that the record herein contains sufficient conflicting testimony to support the jury's decision with regard to the waste site claims. Unless the jury findings are manifestly erroneous, those findings cannot be disturbed on appeal. Stobart v. State, Through Department of Transportation and Development, 617 So.2d 880 (La.1993). Where there are two permissible views of the evidence, the factfinders' choice between them cannot be manifestly erroneous. Rosell v. ESCO, 549 So.2d 840 (La. 1989).
Furthermore, we note that because IP exercised its option to purchase and became obligated to buy "all of said land" that was part of the 1945 Agreement, including the waste sites, Denkmann suffered no damages with regard to the waste sites. As the party in possession of the land when the waste sites were permitted or allowed, IP will be barred from claiming a reduction in purchase price because of the waste sites. Additionally, any claim to a reduction in price by IP would be contrary to the testimony at trial of IP's own witness, Gerald D. Healy, Jr., an expert in environmental engineering and solid waste management. Mr. Healy testified that the waste sites have not devalued the 95,000 acres as a whole.
Likewise, there was no error in the jury's refusal to award damages for Denkmann's alleged future liability for the waste sites. Denkmann claims that IP's failure to fence and maintain the trash sites resulted in a "dramatically increased environmental exposure" for Denkmann. However, Denkmann failed to prove that the waste sites require remediation at the present time, and the only increased liability on Denkmann's part is a mere possibility for the future. For us to make an award now for a future expenditure for a liability that may or may not materialize would be pure speculation.
*309 We will not disturb the jury's decision that Denkmann is not entitled to damages for IP's actions regarding the waste sites.

DISSOLUTION OF CONTRACT OF LEASE
Denkmann's major contention throughout this litigation has been that it is entitled to dissolution of the 1945 Agreement because of IP's alleged breaches of contract.[39] IP, to the contrary, maintains that the alleged breaches are mere ploys of the plaintiffs to avoid their obligation to honor the option to purchase granted by their ancestors in title.
A lease is dissolved either by operation of law[40] or by judicial declaration. In the instant case, we are concerned only with dissolution by judicial declaration, that is, dissolution that must be sued for and obtained by judgment. Unlike dissolution by operation of law, the cause of a judicial dissolution is the fault of a party. Louisiana Civil Code art. 2729 speaks of the neglect[41] of a party, as follows:
The neglect of the lessor or lessee to fulfill his engagements, may also give cause for a dissolution of the lease, in the manner expressed concerning contracts in general, except that the judge can not order any delay of the dissolution.
The provision that the judge shall grant no delay in the dissolution of a lease is, in practice, subordinated to the court's preliminary decision concerning whether a dissolution is appropriate in the first place. One of the fundamental concepts of landlord-tenant law in Louisiana is that the court has considerable discretion in deciding whether a breach of the lease is serious enough to justify dissolution. See Palmer, La.Leases,  5-19.
Dissolution of contracts, including the contract of lease, is explained in 7 Litvinoff, La.Civil Law Treatise, Book 2 (sections and pages cited but footnotes omitted):
The requirements to obtain dissolution of the contract are two: first, the other party's failure to perform; second, that the dissolution be judicially pronounced.
The failure to perform must be sufficiently serious to justify the dissolution of the contract; it must also be imputable to the party who does not perform.
 269, pp. 506-507.
* * * * * *
The dissolution of a contract must be pronounced by the court. The remedy of *310 contract dissolution is not to be regarded as a convenient way for a party to unburden himself of the contract. For this reason, it cannot depend solely on the will of the party complaining of nonperformance by the other. If such were the case, a party might abuse the right in a situation where there was mere delay or only partial nonperformance, and utilize such a relative failure of the other party to perform as a tool to obtain dissolution to the plaintiff's advantage. The intervention of the court is the best possible means of establishing, with certainty, that the complaining party has good reasons to demand dissolution. The principle of judicial dissolution appears, thus, as a necessary consequence of the overriding principle of good faith which subjects the parties to the duty of observing a degree of tolerance in the matter of contract performance.
* * * * * *
The necessity of a judicial demand affords an opportunity for the exercise of the court's sovereign prerogative of weighing all these circumstances with large discretion. It is for the court to determine whether the rendering of only partial performance by the obligor, plus the delay attending a possible completion, or the failure in performing an accessory obligation, warrants dissolution. For this purpose the court takes into consideration the extent and gravity of the failure to perform alleged by the complaining party, the nature of the obligor's fault, the good or bad faith of the parties involved, and also the surrounding economic circumstances that may make the dissolution opportune or not. Upon consideration of all such factors, a choice must be made among several courses of action.
The court may pronounce the dissolution of the contract. This is, of course, the appropriate choice when the obligor has failed to perform out of a fraudulent design; in such a situation the dissolution operates as a sanction for bad faith. A fraudulent intent on the part of the obligor, however, is not necessary to produce dissolution. Any failure to perform involving some fault on his part suffices for this purpose, although a defaulting obligor in good faith will always enjoy the sympathy of the court. The obligor in default may usually prevent dissolution by tendering performance. In its discretion, however, the court may find such a tender or offer to perform untimely and pronounce the contract dissolved because of the obligor's unjustified delay. Together with dissolution, the obligee may recover damages for nonperformance. The court, however, may pronounce dissolution without damages when both parties are at fault, or when no fault can be found in either party.
 270, pp. 508-510.
If taken to the letter, articles 2047 of the Louisiana Civil Code and 1184 of the French would seem to indicate that all a court can do in its discretion is grant a further delay for performance. That is not so....
* * * * * *
It is clear that ... the discretion of the court does not stop at the mere granting of a further time to perform, but extends to determining whether the performance not rendered by defendant was the cause of plaintiff's obligation, in which case dissolution must be granted, or whether the failure in defendant's performance is not so grave as to have deterred plaintiff from entering the contract, had he foreseen it, in which case he will be granted damages or a proportional reduction of his own performance.
 272, pp. 513-514.
In the case sub judice, the jury's answers to interrogatories indicated that the plaintiffs were not entitled to dissolution of the contract, despite its conclusion that the plaintiffs had been damaged by defendants' breach in the amount of $100,000. Likewise, the trial judge, despite an award of over $2,000,000 in damages in its JNOV, decided that the plaintiffs were not entitled to dissolution.
Our review of the record convinces us that the denial of dissolution is consistent with the criteria enumerated by Professor Litvinoff. Defendants' wrongful action of granting seismic permits was not so grave or so extensive as to prevent the action from *311 being completely overshadowed by defendants' satisfactory, long-term management of the 95,000 acres of timberlands. IP did not sell any of Denkmann's property or deplete any of the minerals. Although IP's action constituted a breach of its obligations under the lease, Denkmann did not prove an evil intent on IP's part so as to justify a finding that IP was in bad faith. See Illinois Cent. R. Co. v. International Harvester, 368 So.2d 1009, 1012 (La.1979), holding that the inferences of intent to be drawn from the actions of large corporations differ from the inferences from individuals' actions.
Furthermore, the economic circumstances in the instant case suggest the necessity for strict judicial scrutiny of the plaintiffs' claim for dissolution. As Professor Litvinoff indicated, the court must guard against a complaining party turning a relatively inconsequential nonperformance into an opportunity to avoid a long-term commitment. Denkmann argues on appeal that the damages amounting to $2,056,905 are not inconsequential when compared to the original price for the timber, $2,440,000. However, Denkmann's comparison is flawed, as the evidence shows the original price by today's value would exceed $17,000,000, and a significant part of the consideration in 1945 was IP's assumption of the taxes.
Judicial caution in considering dissolution is especially important in cases such as this one in which the original contracting parties have been replaced by successors in title who may not be satisfied with the business decisions of their ancestors.
Finally, when we consider the evidence of Denkmann's motives for entering into the contract and of plaintiffs' dealings with IP throughout the years, including but not limited to the 1969 Agreement, we cannot say that plaintiffs' ancestors in title would not have entered into the 99-year lease if they had foreseen the breaches which now entitle the plaintiffs to compensatory damages. Denkmann claims the clause making the owners' mineral rights paramount to the lessees' rights shows that the mineral reservation was a major cause of the 1945 Agreement. We disagree. The protection of their mineral rights may have been the owners' major reason for choosing a lease instead of a sale. But the owners' desire to have the timberlands managed and produced and to have the tax burden assumed was the major cause for contracting with the defendants for a 99-year lease. Because the owners needed no contract whatsoever with the defendants to develop the minerals on their own lands, the mineral reservation was not a major cause of the 1945 Agreement.
We find no merit in Denkmann's contentions that the lease should have been dissolved by the trial court.[42]

OPTION TO PURCHASE
Of major consideration in this litigation is the option to purchase clause included in the 1945 Agreement. From the outset of this litigation, IP has maintained that the motive for Denkmann's allegations of breach was to avoid its obligation to cooperate with IP's exercise of the option to purchase. IP introduced into evidence a "CONFIDENTIAL MEMORANDUM" by a forestry consultant dated May 31, 1979. In the memorandum *312 the consultant mentions working with different clients toward termination of long-term leases and cutting contracts between the clients and large forest industries. The consultant states that "we now are able to see areas of possible negotiation which may permit the landowners to obtain release of at least part of their lands." The memorandum includes calculations based on several assumptions, but with a "bottom line" of profit to the Denkmann owners of over $16,000,000 if they were to effect a release of 25% of the IP lease.
On appeal Denkmann urges that the option clause is unenforceable because on its face it fails to meet the requirements of the Louisiana Civil Code and the jurisprudence.[43]
The 1945 Agreement provides for an option to purchase as follows:
As a part of the consideration of this contract, Vendee shall have the option at any time between January 1, 1986, and December 31, 1995, to purchase all of said lands, with full reservation to Vendor of all minerals and rights therein, and the accessory rights necessary to full mineral development, at a price to be fixed by three arbitrators to be named at that time,ÔÇöone by Vendor, its successors and assigns, one by Vendee, its successors and assigns, and the third by the two so named; or in case they shall be unable to agree upon said third arbitrator, said third arbitrator shall be named upon application by either party by one of the Judges of the United States District Court for the Eastern District of Louisiana, after notification to the other party of intent to apply to such Judge for such appointment.
Under our law an option to purchase is an elective right that can ripen into a binding contract to buy and sell; an option to purchase is governed by the provisions of LSA-C.C. art. 2462. McMikle v. O'Neal, 207 So.2d 922 (La.App. 2d Cir.1968). Article 2462 provides:
A promise to sell, when there exists a reciprocal consent of both parties as to the thing, the price and terms, and which, if it relates to immovables, is in writing, so far amounts to a sale, as to give either party the right to enforce specific performance of same.
If an option clause is so ambiguous as to contain no expression of either the thing or the price and terms, then the contract is void and the purported promise to sell is of no effect for want of certainty. Cascio v. Schoenbrodt, 431 So.2d 32, 35 (La. App. 1st Cir.), writ denied, 439 So.2d 1071 (La.1983).
Our initial step in interpreting the option clause is to decide whether the clause is ambiguous. Contrary to Denkmann's urgings, we find that the option clause is not ambiguous.[44]
Denkmann asserts in its original brief that the parties have "vigorously disagreed" about the thing and the price provided in the option, demonstrating that the clause does not contain a complete expression as required by Louisiana law. However, a disagreement about the terms of a contract to sell must be reasonable and not merely a subterfuge to avoid the clear meaning of the obligation entered into by the contracting parties. We find that Denkmann's "disagreements" with the provisions of the contract are not reasonable.
First, Denkmann claims that the option clause does not provide for the thing to be purchased, as required by LSA-C.C. art. 2462, because the option does not specify whether the standing timber is to be part of the "thing" at the time the option is exercised. We see no need for the option language to specify standing timber as part of the thing being purchased, because by leasing the lands in 1945 for a term of 99 years, *313 IP procured rights in 1945 to the timber that would be standing at the time of the exercise of the option between 1986 and 1995. Thus, "all of said lands" means the lands owned by Denkmann and leased to IP in 1945.
Next, Denkmann claims that the option clause is silent on whether the purchase price will include the value of IP's right to obtain mineral rights to all non-producing minerals after ten years. It is clear that under Louisiana law oil and gas in place are not subject to absolute ownership as specific things apart from the land. Hodges v. Long-Bell Petroleum Co., 240 La. 198, 121 So.2d 831 (1960). Therefore, the price to be determined by the appraisers necessarily will include the value of the minerals, subject to the reservation in the option. We find no vagueness in the option clause regarding the price and the thing.
Finally, Denkmann argues that the jurisprudence bars the mechanism chosen by the parties to establish a price. Although the price must be certain, LSA-C.C. art. 2464, the price may be left to arbitration of a third person, LSA-C.C. art. 2465. We cannot agree with Denkmann that Louisiana case law makes the price-setting mechanism chosen by the parties to the 1945 Agreement unenforceable. It is true that in Louis Werner Sawmill Co. v. O'Shee, 111 La. 817, 35 So. 919 (1904), the court held an option unenforceable because it provided for only two arbitrators, with no mechanism for solving a stand-off between them either by a third arbitrator or by a court of law. However, in Shell Oil Co. v. Texas Gas Transmission Corp., 210 So.2d 554, 559 (La.App. 4th Cir.) writs refused, 252 La. 847, 214 So.2d 165, 214 So.2d 166 (1968), the court explained O'Shee and quoted pertinent language:
"What is essential" says Marcade, Comm. on art. 1592, C.N., "is that the parties should have bound themselves in such way that the price may be thereafter determined as a mere consequence of the consent given by them, without any new act of volition on their part. If, for example, after the parties had said that the sale was made for a price as to which they would agree thereafter, they added, or which, in case of disagreement, should be fixed by an expert to be appointed by the parties themselves or by the judge of the district, it is clear that there would be a sale, since it would no longer be within the power of the parties to prevent the fixing of the price. The result would be the same if, without expressing themselves thus explicitly, the parties had, however, manifested the idea of leaving matters to the courts, if need were, to name one or more experts; but, when nothing indicates such a consent, the fixing of the price will have to be by the expert or experts that the parties will have designated, and if one of them refuses, or dies, or is unable to make the estimation, there will be no sale, the condition upon which it depended not having materialized."
In the instant case, as in Shell Oil, the parties bound themselves to a price to be determined by experts. The 1945 Agreement assures that a price will be reached by a majority of a three-person panel, whether the third person be agreed upon by the two arbitrators or be appointed by the court. We conclude, as did the Shell Oil court, that the 1945 Agreement "provided a method by which a price could be determined by third parties in future negotiations, one that could not be frustrated by any act of commission or omission of either buyer or seller." Shell Oil Co. v. Texas Gas Transmission Corp., 210 So.2d at 560. Accordingly, there is no merit in Denkmann's argument that the option clause is unenforceable. Because we have reached this decision, discussion of the related assignments of error urged by Denkmann is unnecessary.[45]
In a final attempt to bar execution of the option, Denkmann asserts that the *314 court's order of specific performance of the option clause was erroneous in light of IP's breaches of the contract.[46] In making this argument, Denkmann relies primarily on the case of Kizer v. Burk, 439 So.2d 1051 (La.1980). Denkmann also cites Powell v. Codifer & Bonnabel, Inc., 167 La. 97, 118 So. 817 (1928), and Pruyn v. Gay, 159 La. 981, 106 So. 536 (1925). All three cases are inapposite here.
In Kizer, the parties bound themselves to buy and sell when they entered into a three-year lease of farm land. Judgment was for the landowner dissolving the contract because of breaches of the lease terms by the lessee. The court noted that the contract to sell at the termination of the lease was conditioned on the faithful performance of the lease. Performance of the obligations was a suspensive condition of the agreement to sell; when the condition failed, neither party was entitled to specific performance under LSA-C.C. art. 2462.
In contrast, the breach of the lease in the instant case was not so significant as to warrant termination of the lease, nor so significant as to bar exercise of the option. Absent significant breaches and absent a specific termination clause in the lease making mere partial failure of performance a suspensive condition, the option ripened into a binding contract to buy and sell when it was exercised by IP. The trial court did not err in failing to hold that IP was barred from exercising its option.
Powell was a "bond for deed" case in which the plaintiff agreed to buy two lots for $100 down and $25 for 36 consecutive months, a total of $900. After paying $550, the plaintiff "dropped out of sight" until the value of the property increased to $7,500, and then she brought suit for specific performance of the contract. The court denied relief, noting that the plaintiff had abandoned the contract by failing to pay the consideration. Powell is inapplicable here, as there has been no abandonment of the contract by defendants.
In Pruyn, the written agreement to sell was specifically made conditional on the timely payment of the purchase price in installments by the would-be purchaser. In a suit by the would-be seller to annul the contract, the court rendered judgment in the owner's favor because the would-be purchaser was more than a year in arrears of his payments. Pruyn is not on point here.
We conclude there is no merit in Denkmann's averment that IP was barred from exercising the option.

VARIOUS TRIAL COURT ERRORS
Denkmann urges the trial court made various errors that this court should now correct. Although we decline to do so, we will address the alleged errors briefly.

Negligence and fiduciary duty:
Plaintiffs submit the jury was unable to make an award for their claims against IP sounding in negligence and for breach of fiduciary duty because the trial court did not give the jury special interrogatories on those claims.[47] Denkmann surmises that the trial court may have considered these claims to have been subsumed by the breach of contract claims.
Assuming for the sake of argument only, that it was error for the trial court to omit the submissions to the jury, our review of the record convinces us that it was merely harmless error. The evidence we have reviewed in conjunction with Denkmann's claims against IP for the five categories of breach of contract convinces us that Denkmann is not entitled to damages other than the award for *315 interference with minerals by unauthorized seismic exploration.
There is no merit in Denkmann's claim that we should make an award for damages caused by negligence and breach of fiduciary duty.

Admission of evidence:
Denkmann claims the trial court erred in admitting testimony about conversations with a deceased Denkmann employee and in admitting evidence of Denkmann's mineral wealth.[48]
Suffice it to say that the evidence referred to by Denkmann, even if admitted erroneously, was not so prejudicial as to influence either the jury's or the trial court's decisions concerning dissolution of the contract or damages. We find no reversible error here.

Exclusion of evidence:
Finally, Denkmann claims the trial court erred in excluding evidence of IP's alleged lobbying of the legislature for favorable changes in the law of leases.[49]
This allegation of error is clearly without merit. It is elementary that the trial judge is given great discretion in assessing the probative value of evidence. Even if proffered evidence is relevant, it may be excluded if its probative value is outweighed by considerations of undue delay or waste of time. LSA-C.E. art. 403. We conclude that Denkmann failed to demonstrate that the evidence of lobbying was relevant or of substantial probative value.

INTEREST
We next consider Denkmann's assertion that the trial court should have awarded interest from a date previous to the date of its judicial demand in state court.[50] The judgment in Denkmann's favor rendered on February 27, 1992, provides for legal interest from date of judicial demand until paid. The judgment in Denkmann's favor rendered on May 10, 1993, provides for legal interest "from date of judicial demand, April 16, 1990, until paid." April 16, 1990 was the date Denkmann filed its answer and reconventional demand in the Nineteenth Judicial District Court, Parish of East Baton Rouge, State of Louisiana.
IP has not challenged the award of interest on appeal, apparently acknowledging that the case of Trans-Global Alloy v. First National Bank, 583 So.2d 443 (La.1991), is dispositive of the question of whether interest in a breach of contract case should be awarded from the date of judgment or the date of judicial demand. Explaining the differences between the common law and the civilian concepts of interest, the Louisiana Supreme Court held that in a breach of contract case, a prevailing party is entitled to interest from date of judicial demand even though damages are not ascertainable until the date of judgment. However, we do not read the court's holding as requiring an extension of the Louisiana rule to a date of judicial demand in another jurisdiction, such as the federal district court. We find no merit in Denkmann's argument that interest should have run from August 15, 1986, the date suit was filed in federal court.
Additionally, in Trans-Global Alloy, the court considered a contention by the plaintiff that interest should have started to run from *316 the date of the defendant's breach, some two and a half years before suit was filed. The court considered and distinguished its previous holding in Alexander v. Burroughs Corp., 359 So.2d 607 (La.1978), wherein damages were ascertainable on the date the plaintiff's attorney placed the defendant in default by formally demanding cancellation of a sale for redhibitory defect, and interest was awarded from the date of default instead of the later date when suit was filed. The court noted that Trans-Global Alloy was a "highly complicated" case in which three courts had difficulty in determining whether there had been a breach of contract meriting compensation and what the consequential damages of that breach were. The court held that the amount of the debt was not ascertainable until the date of judgment. Trans-Global Alloy v. First National Bank, 583 So.2d at 459.
The Trans-Global Alloy holding leaves intact the rule that interest runs from the due date of a debt only if the amount is ascertainable. The rule bars the running of interest from a due date prior to judicial demand when the amount of the debt is ascertainable only by a court's award. See New Orleans v. United Gas Pipe Line Co., 517 So.2d 145 (La.App. 4th Cir.1987), cert. denied sub nom., 488 U.S. 917, 109 S.Ct. 273, 102 L.Ed.2d 262 (1988).
Denkmann contends interest should have run from the date of breach sometime prior to November of 1985, or from the time of its "letter of default" dated November 20, 1985. According to the jurisprudence, the only question before us is whether IP's debt (damages) was ascertainable any time prior to the date of judicial demand.
To say that the instant case is a complicated one is a gross understatement. The litigation originated in the federal court, moved to the state court, and finally went to trial before a jury. The trial lasted four months. Post-trial motions occupied 15 months between the first judgment and the JNOV. Both sides appealed the judgments, and both sides answered the appeals. Fortunately, the lengthy briefs are quite articulate and scrupulous about citations to the voluminous record. The record on appeal consists of 102 volumes, including more than 22,000 pages of transcribed testimony. There are 109 charts and 20 boxes of exhibits and attachments. Considering the above description of the proceedings and the record, one could not, by any stretch of the imagination, term the amount of the debt "ascertainable" prior to the court's decision.
There is no merit to Denkmann's contention that the date of the running of legal interest should be other than the date of the judicial demand in state court.

COSTS
Finally, Denkmann asserts that the trial court erred in splitting the costs between the litigants.[51] In view of the complexity of the litigation and the disposition of the parties' various claims, we find this argument to be without merit.
The pertinent statute is LSA-C.C.P. art. 1920, which provides in part:
Unless the judgment provides otherwise, costs shall be paid by the party cast....
Except as otherwise provided by law, the court may render judgment for costs, or any part thereof, against any party, as it may consider equitable.
Indeed, IP was the party cast for damages. But as to some unsuccessful claims, such as the unenforceability of the option, Denkmann must be counted as a "party cast." We find it was entirely equitable for the trial court to split costs between the two sides.

CONCLUSION
Accordingly, we vacate the portion of the judgment awarding the plaintiffs $100,000, and we affirm the portion of the judgment of the trial court awarding $2,056,905, together with legal interest thereon from date of judicial demand, April 16, 1990, until paid. In all other respects, we affirm the trial court's judgment. We cast the plaintiffs and the defendants with fifty percent each of the costs of this appeal.
REVERSED IN PART; AFFIRMED IN PART.
*317
 APPENDIX
 JURY VERDICT
1. Is the 1945 Agreement an indivisible or a divisible contract?
Indivisible _______
Divisible X 
2. What did the 1945 Agreement create with respect to the land described in the Agreement and
attached property descriptions:
Lease X 
Usufruct _______
Other Type of Servitude _______
3. What did the 1945 Agreement create with respect to the timber:
Sale X 
Usufruct _______
Other Type of Servitude _______
4. What did the 1945 Agreement create with respect to the trees, wood and other forest products
described in that Agreement and in existence on that date:
Sale X 
Usufruct _______
Lease _______
Other Type of Servitude _______
5. What did the 1945 Agreement create with respect to the trees, wood and other forest products
described in that Agreement that may in the future, within the lifetime of the Agreement, stand,
grow or be situated on the lands described in Agreement:
Sale X 
Usufruct _______
Lease _______
Other Type of Servitude _______
6. Is the Option Clause of the 1945 Agreement valid and enforceable:
Yes X 
No _______
*318
7. Is the 1969 Letter Memorandum valid and enforceable:
 Yes X 
 No _______
8. Did the defendants breach any of the following duties allegedly owed to the plaintiffs under the
1945 Agreement:
 YES NO
a. Good Forestry Practices _______ X 
b. Encroachments _______ X 
c. Waste Sites _______ X 
d. Surface Leasing X _______
e. Interference with Minerals _______ X 
If the answers to all of the subparts of the above questions are NO, proceed to Question 19.
f. Did this breach(s) cause any damage to the Plaintiffs:
 Yes X 
 No _______
9. Are Denkman Associates and Denmiss Corporation entitled to the dissolution of the 1945 Agreement:
 Yes _______
 No X 
10. Are the Mineral Distributees entitled to the dissolution of the 1945 Agreement:
 Yes _______
 No X 
11. Are Denkmann Associates and Denmiss Corporation estopped from terminating the 1945 Agreement:
 Yes X 
 No _______
12. Are the Mineral Distributees estopped from terminating the 1945 Agreement:
 Yes X 
 No _______
*319
13. Are Denkmann Associates and Denmiss Corporation entitled to any damages as a result of any
breach of the 1945 Agreement:
 No X 
 Yes _______
14. Are the Mineral Distributees entitled to any damages as a result of any breach of the 1945
Agreement:
 Yes _______
 No X 
15. If the answer to Question 13 or 14 was YES, indicate the amount, if any, that would adequately
compensate Denkmann Associates, Denmiss Corporation and the Mineral Distributees for those
damages in the following areas:
 AMOUNT (if any)
a. Good Forestry Practices $ 0 
b. Encroachments $ 0 
c. Waste sites $ 0 
d. Surface Leasing $ 10,000 
e. Interference with Minerals $ 0 
16. Did Denkmann Associates and Denmiss Corporation know or should they have known of their
damage prior to December 19, 1975 in reference to the following allegations:
 YES NO
a. Good Forestry Practices X _______
b. Encroachments X _______
c. Waste Sites X _______
d. Surface Leasing X _______
e. Interference with Minerals X _______
17. Did the mineral distributees know or should have known of their damages prior to December 19,
1984:
 Yes X 
 No _______
*320
18. Did the mineral distributees know or should have known of their damages prior to December 19,
1975:
 Yes X 
 No _______
19. If an answer to Questions 3 or 4 or 5 was USUFRUCT, or the answer to Question 9 was YES and
the answer to Question 11 was NO, was there any timber trespass on the lands after September,
1974 by the defendants:
 Yes X 
 N/A
 No _______
20. Was the timber trespass willful and intentional:
 Yes X 
 N/A
 No _______
21. What was the fair market value of any trees cut, felled, destroyed or removed by the defendants:
 AMOUNT (if any) $_______________________ N/A
NOTES
[1] Although the caption reflects suit was brought by IP Timberlands Operating Company, Ltd. and International Paper Company, the trial court reversed the procedural posture of the parties and allowed the original defendants to proceed first at trial as "plaintiffs." Accordingly, we refer to the parties in the posture assigned to them by the trial court.
[2] The individual mineral distributees are Carolyn Fitzpatrick. Individually and of Northern Trust Bank of Florida/Sarasota N.A., Trustee of John D. Shuler Trust for Ann Shuler Blair; Cyril Ann Mandelbaum, Individually and as Trustee of John D. Shuler Trust for Elise Shuler Geraghty; Carolyn Fitzpatrick, Individually and of Northern Trust Bank of Florida/Sarasota N.A., Trustee of John D. Shuler Trust for Jean Shuler Rawson; Carolyn Fitzpatrick, Individually and of Northern Trust Bank of Florida/Sarasota N.A., Trustee of Catherine M. Shuler Trust for Ann Shuler Blair; Cyril Ann Mandelbaum, Individually and as Trustee of Catherine M. Shuler Trust for Elisa Shuler Garaghty; Carolyn Fitzpatrick, Individually and of Northern Trust Bank of Florida/Sarasota N.A., Trustee of Catherine M. Shuler Trust for Jean Shuler Rawson; T.B. Davis; Susanne D. Shuler; Thomas B. Stibolt, Executor of the Estate of Helen D. Stibolt Johnson; Thomas B. Stibolt, Ruthmarie Stibolt Harpham, and Philip H. Stibolt, Trustees for Victor D. Stibolt; Frank K. Heap, Trustee for Thomas B. Stibolt; Frank K. Heap, Trustee for Richard Stibolt; N.B. Shuler; John Doe, Successor to Charles Blair, deceased, Individually and as Trustee for Alden Davis Shuler; Gerald E. Raby, Trustee for Susanne E. Shuler Klokner; Robert W. Graves, Trustee under Ruth Lee Baxter Trust Indenture of 9-20-49; Lee West Monroe; Patricia G. Libbey; James C. Reeder; Patricia Eubank; Margaret and John Heckman; Gene Wicklander; Debora M. Patchell; Pearl Associates, A Mississippi General Partnership; Frederick A. Reimers; Alison Reimers Lyell; Margaret Reimers Graves; John C.A. Reimers; John F. Schneider; Carl R. Schneider; Carl D. Reimers; Linda Reimers Mixson; Ethleen Reimers Taggart; Ethleen Reimers Taggart, Trustee U/W of Ray S. Reimers for George K. Taggart, III; Ethleen R. Taggart, Trustee U/W of Ray S. Reimers for Ray Reimers Chilton; John L. Jerry, Trustee of Residuary Trust U/W of Anna R. Richardson; John L. Jerry, Trustee of Residuary Trust U/W of Charles C. Cook; John H. Hauberg; Catherine Hauberg Sweeney; John Doe, Successor to Walter Hulstedt, deceased, Individually and as Trustee for the Robert D. Marshall Trust; Robert D. Marshall, Jr.; Prudence Sutherland Brooks; Lorne A. Reimers, Marietta R. Schneider and J. Thomas Lewis, Trustee under Art. 11 of Will of F.W. Reimers (WARREN TRUST); Lorne A. Reimers, Marietta R. Schneider and J. Thomas Lewis, Trustee under Art. 11 of Will of F.W. Reimers (MARIETTA TRUST); George Taggart, Estate; Charlotte C. Foster and Sarah C. Klinkon, Executrixes of the Estate of Mary Catherine Cook; Charlotte C. Foster; and Sarah C. Klinkon.
[3] Oil and gas are not owned until reduced to possession. Succession of Rugg, 339 So.2d 519 (La.App. 2d Cir.1976), writ denied, 341 So.2d 897 (La.1977). Thus, the term "mineral distributees" is somewhat misleading, but it is the term which has been used throughout this litigation by both sides, and we will continue using the term.
[4] Denkmann reserved a vendor's lien as security for failure of Southern Kraft to pay the cash price. Another clause allowed termination of the contract for failure to pay the taxes. It is undisputed that neither of these conditions came into existence so as to trigger the automatic termination provisions.
[5] The dismissal was pursuant to a ruling in Carden v. Arkoma Associates, 494 U.S. 185, 110 S.Ct. 1015, 108 L.Ed.2d 157 (1990), that a limited partnership such as IPTO must consider the citizenship of its limited partners for diversity purposes.
[6] Defendants' assignment of error No. 1 states: "The trial court should have entered its initial judgment in conformity with the jury's verdict. Because the jury found that the plaintiffs' surface leasing claims were barred by prescription and estoppel, the award of $100,000 to the plaintiffs in the initial judgment was erroneous."

Defendants' assignment of error No. 2 states: "The trial court's initial judgment was in effect a JNOV on the jury's findings of prescription and estoppel as to surface leasing, leaving the trial court without authority to entertain a second JNOV on the plaintiffs' claims for interference with minerals. Accordingly, if the February 27, 1992 judgment for $100,000 is effective, then the trial court's second judgment dated May 12, 1993 was a nullity."
[7] Defendants' assignment of error No. 3 states: "Even if the trial court had authority to entertain a JNOV motion on the mineral claims, it should not have granted it. The record fully supported the jury's verdict finding no interference with minerals and no damages, and the further finding that these claims were barred by the defenses of prescription and estoppel. The trial court's decision to overrule at least four factual findings by the jury and award an additional $2,056,905 in damages for interference with minerals, therefore, was erroneous."
[8] Plaintiffs' assignment of error No. 1 reads as follows: "The trial court, having found that `the contract's design was to avoid two (2) Louisiana laws and public policies,' erred in failing to find the Agreement void ab initio under Louisiana law and, therefore, an absolute nullity."
[9] The lease entered into by McCain's ancestor in title with the defendant corporation was similar to the 1945 Agreement, in the following respects: (1) the immediate payment of a substantial price per acre; (2) payment of taxes for the 99-year term; (3) retention of minerals by the owners; (4) the obligation of lessee to allow full ingress and egress and right of way and cooperation in the use of areas of the surface needed to develop the minerals; and (5) the prospective return of the lands after 99 years for the benefit of the lessors' heirs or assigns. See McCain, 299 So.2d at 458.
[10] Plaintiffs' assignment of error No. 2 reads as follows: "The trial court erred in failing to find that the Agreement created a usufruct which terminated in 1975, by operation of law."
[11] See Note 3, supra.
[12] The court's description is consistent with the jury's response that the 1945 Agreement created a "sale" of future timber. See Appendix.
[13] "If there is any doubt as to what was meant by [a clause in a lease], the practical construction placed thereon by the parties should be the standard for resolving the doubt.

* * * * * *
"In Metcalfe v. Green, 140 La. 950, 74 So. 261, 266, the Supreme Court said: "`When the intent of the parties is doubtful,' says the Code, `the construction put upon it, by the manner in which it has been executed by both, or by one with the express or implied assent of the other, furnishes a rule for its interpretation.' C.C. art. 1956; Marcotte v. Coco, 12 Rob. 167; Fontain v. Manuel, 46 La.Ann. 1373, 16 So. 182; Succession of Bidwell, 51 La.Ann. [1970] 1986, 26 So. 692." "
Poulos v. Liuzza, 43 So.2d 59, 61 (La.App. Orl.1949).
[14] Plaintiffs' assignment of error No. 15 reads: "The trial court erred in admitting evidence of the 1969 Letter Memorandum, and in failing to determine that such Agreement was invalid and unenforceable as a matter of law." This argument is clearly without merit, as the document was admissible as proof of the relationship between the parties during the term of the 1945 Agreement. Whether or not the 1969 Agreement was "invalid and unenforceable as a matter of law" is immaterial.
[15] Other elements of the lease contract are its form, its term, the price, consent of the parties, and special conditions, if any, such as an option to purchase. Comment, The Louisiana Law of Lease, 39 Tul.L.Rev. 798 (1965). We have previously discussed the term of the 1945 Agreement. We will discuss, hereinafter, the option to purchase and other special conditions. The parties have not questioned the price or the consent of the parties. Therefore, our discussion of the characterization of the 1945 Agreement as a lease will focus on the object of the contract.
[16] Designation as a tree farm is premised on the existence of management techniques aimed at securing continuous production of timber. A tree farm is not defined by reference to its character at the time of the growth, but rather by the land's ability, through management techniques, to provide sustained yields. Succession of Doll, 593 So.2d at 1249. It is undisputed that the land involved in the instant litigation could have been classified as a tree farm prior to the 1945 Agreement.
[17] In light of the conclusion we have reached, it is unnecessary for us to discuss plaintiffs' assignment of error No. 16, which reads as follows: "By tendering Special Interrogatory Nos. 1-7, the trial court erred in referring strictly legal issues of the legal characterization and validity of an unambiguous contract to the jury."
[18] Denkmann's reliance on United States Daughters of 1812-Chalmette Chapter v. Louisiana Dept. of Culture, Recreation, and Tourism, 404 So.2d 941 (La.1981) is misplaced. That case is inapposite here because it involved the reservation of a right of occupancy by a vendor, not a conveyance of rights for commercial development.
[19] Reasonable minds could not conclude that the claim for the unauthorized seismic permits had prescribed. The first of the 56 unauthorized seismic permits issued on Denkmann's unleased land was issued on June 15, 1978. Suit was filed on August 15, 1986.
[20] Denkmann's mineral rights and IP's rights to damages arise from paragraphs 8 and 9 of the 1945 agreement, which provide as follows:

8. Vendor expressly reserves to itself the right to make and grant any and all oil, gas, gravel and other mineral leases and contracts necessary or desirable to the full mineral development of the said lands, and reserves to itself the surface rights necessary for the performance of such mineral contracts and the full mineral development of the property, including the right to use roads, canals and ways for ingress, egress and regress of persons and property in the said mineral development, and the use of the surface for pipe lines, telephone and telegraph lines, storage bins, derricks, camp sites and other appurtenances necessary, proper or desirable for the purpose of oil, gas, gravel and mineral development of all kinds of the property. Vendor moreover shall have the use of all roads, tramroads, logging railroads and other ways for the purpose of having ingress, egress and regress to and from all released lands for all purposes in connection with said lands. In case of such use by Vendor, Vendor shall hold Vendee harmless from loss or damage resulting from such operations by Vendor. (Emphasis supplied.)
9. If Vendor, its successors or assigns, requires the exclusive use of any of the lands for such purpose as buildings, pipe lines, warehouses, or for storage tanks or other accessories of mineral development, Vendor's right to such use shall be paramount to any rights herein conveyed to Vendee, and Vendee shall not interfere in any manner with such use; provided, however, that Vendor shall, on demand of Vendee, pay to Vendee the value of any timber, trees, wood and other forest products on the lands so used, and shall pay to Vendee the fair value of any road or other improvement actually placed upon said lands by Vendee and still in use by Vendee, of the use of which Vendee shall be deprived. Vendee shall have the right, at its option, to remove any severed timber, trees, wood and other forest products instead of accepting payment therefor, provided such removal is accomplished with reasonable promptness. In settling for timber, trees, wood and other forest products the fair stumpage market value at the time shall be used. Vendee shall be exonerated from any obligation to pay taxes upon any governmental quarter-quarter section upon which any such building, warehouse, storage tank or derrick is erected. (Emphasis supplied.)
[21] Although the individual mineral distributees and not the Denkmann corporations owned mineral interests in the property at the time the 1945 agreement was signed, the corporations eventually became owners of all but 3.673 of the mineral acres.
[22] Mr. Bill Hise testified that it is not unusual for seismic permits to contain clauses disclaiming warranty of ownership of the minerals.
[23] Mr. Leon Comeaux, an expert in petroleum geology, explained that exploration by the vibroseis method involves the creation of shock waves by vibration rather than dynamite charges.
[24] The reference to Mobil Oil Company in the permit exists because IP had contracted a mineral lease with Mobil on all properties in which IP owned mineral rights. Mr. Leon Comeaux testified that his review of the unauthorized seismic permits revealed that 23 of the permits issued on Denkmann mineral acreage made reference to Mobil Oil as the mineral lessee of the property.
[25] IP owned approximately 5,000 acres in Louisiana in fee.
[26] Although we acknowledge the existence of testimony that shot hole fees were often used as a quick measure for surface damages, this fact does not change our opinion as to implications of this type of payment when it is encompassed in a permit for seismic exploration.
[27] Mrs. Peck also testified concerning the data derived from the driller's logs that GCO received from the seismic companies. She received over 2,000 driller's logs during her tenure and approximately 10 of them indicated the presence of lignite, gravel or sand; those logs were transmitted from her desk to the hardrock mineral department.
[28] Exhibit C is a reference to a portion of the conveyance contract between IPCo. and IPTO which states:

In the event Grantor performs, or causes to be performed, any seismic, core drilling or other exploratory operations on the Mineral Premises, Grantor shall pay Grantee for all shot holes, core holes and drill holes placed thereon at the rate of $50 per hole for both seismic survey shot holes and conventional drilling, or $500 per mile for "mini-hole" seismic programs. When Vibroseis equipment is used, Grantor will pay $300 per mile. Grantor agrees to make such payment promptly upon completion of such exploratory operations. Such payment shall be for minimum damages to the surface of the Mineral Premises and shall be in addition to any other damages due Grantee as provided above.
[29] Furthermore, the GCO financial records show that the fees collected on the permits issued on Denkmann land were recorded as mineral income.
[30] The testimony concerning the policy was corroborated by a letter written by Denkmann's representative, Mr. Rudy Ewing, in 1971 concerning a permit for Teledyne. The letter stated that "[t]he mineral interests under these lands are owned by the Distributees of Natalbany Lumber Company and it has not been their policy to grant geophysical permits on unleased minerals...."
[31] On cross-examination, Mr. Comeaux admitted that there were instances in which Denkmann granted seismic permits without securing leases; however, we consider them insufficient to undermine Denkmann's general policy.
[32] Plaintiffs' assignment of error No. 25 states, "The trial court erred in failing to award Denkmann an additional $485,932.12 in wrongful geophysical permitting fees collected by IP."
[33] Callon released the mineral lease on January 9, 1986, after Denkmann was cut out of the production of the Lockhart Crossing Field in September of 1985. IP also participated in the production of the Lockhart Crossing Field through its mineral ownership in certain lands.
[34] This argument is contradicted by the fact that IP continued using the same rent contract that Denkmann was using before the 1945 Agreement. It is further contradicted by correspondence from Mr. Graves, Denkmann's attorney, suggesting the use of rent contracts on lands which it was managing as fee owners.
[35] A 1945 cruise summary depicting 150 encroachments reveals the severity of the encroachment problem at that time. (exhibit 20,005 end of volume 73 Mr. Tyler) The problem was also recognized in the timber cruise performed by Pomeroy in 1941 wherein it was reported that:

[I]t will be important to give the land close supervision to prevent trespass, which has been found in a very marked degree, varying from small cuttings of fuel wood to complete cuttings of timber and pulp wood. The trespass up to this time may have consumed the entire rate of growth enjoyed by the land.
[36] We further note that the escrow agreement gave IP the right to release any lands for which it believed it could not clear title.
[37] Plaintiffs' assignment of error No. 6 states: "The trial court erred in failing to find that Denkmann is entitled to damages in the amount of $2,143,500 by virtue of IP's breach of its duty to prevent encroachments on the Denkmann lands."

Plaintiffs' assignment of error No. 14 states in pertinent part: "The trial court erred in failing to correct the jury's finding that Denkmann's encroachment... [claim] had prescribed or that Denkmann was estopped...."
[38] Plaintiffs' assignment of error No. 8 states: "The trial court erred in failing to find that Denkmann is entitled to damages in the amount of $10,000,000 by virtue of IP's breach of the Agreement by allowing waste sites to be established on the Denkmann lands."

Plaintiffs' assignment of error No. 14 states: "The trial court erred in failing to correct the jury's finding that Denkmann's ... waste site claims had prescribed or that Denkmann was estopped...."
[39] Plaintiffs' assignment of error No. 3 states:

"The trial court erred in failing to dissolve or terminate the Agreement, after finding that IP had breached its obligations by interfering with Denkmann's paramount mineral and surface interests."
Plaintiffs' assignment of error No. 4 states: "The trial court erred in failing to dissolve or terminate the Agreement upon the jury's determination that IP had breached its obligations by granting improper surface leases."
Plaintiffs' assignment of error No. 5 states: "The trial court erred in failing to determine that the uncontroverted evidence supports Denkmann's claim that IP breached its duty to prevent encroachments on the Denkmann lands and in failing to correct the jury's finding on this claim and, further, in failing to grant dissolution of the Agreement as a result of the breach."
Plaintiffs' assignment of error No. 7 states: "The trial court erred in failing to correct the jury's finding that IP adequately maintained the waste sites on Denkmann lands and informed Denkmann of their existence; and, further, in failing to grant dissolution of the Agreement as a result of the breach."
Plaintiffs' assignment of error No. 9 states: "Alternatively, the trial court erred in failing to partially dissolve the Agreement as to the 26,048.79 acres of Denkmann land upon which the court found that IP had breached the agreement by interfering with Denkmann's mineral interests."
Plaintiffs' assignment of error No. 10 states: "Alternatively, the trial court erred in failing to partially dissolve the Agreement as to the acreage affected by IP's encroachment, waste site and surface leasing breaches."
[40] A lease is dissolved by operation of law: 1) at the expiration of the term fixed by the lease, LSA-C.C. art 2727; 2) by the total destruction of the leased object by force majeure, LSA-C.C. arts. 2697, 2699, 2728; 3) by the public appropriation of the thing, LSA-C.C. art 2697; or 4) at the termination of the lessor's usufruct, LSA-C.C. art. 2730.
[41] Another ground for dissolution of a lease is failure of cause. See LSA-C.C. art. 2699 which grants to the lessee the right to annul a lease when the thing has, through accident, become unfit for its purpose, or when the use of the thing has been much impeded.
[42] Because we agree with the jury and the trial judge on the issue of dissolution, we need not discuss alleged errors in trial procedure related to their decisions.

Plaintiffs' assignment of error No. 17 states: "By tendering Special Interrogatory Nos. 9-10, the trial court erred in referring the legal issue of whether dissolution is the appropriate remedy to the jury."
Plaintiffs' assignment of error No. 18 states: "The trial court's error in tendering legal questions to the jury was compounded by its failure to provide proper or complete instructions concerning such issues as ... the remedy of dissolution, indivisibility, severability and conditional sales."
In light of our decision that dissolution is not proper, we need not discuss whether the trial court erred in submitting the issue of estoppel to the jury, as the only jury response regarding estoppel was that the plaintiffs were estopped from terminating the agreement.
Plaintiffs' assignment of error No. 19 states: "The trial court erred in referring Special Interrogatory Nos. 11-12 on estoppel to the jury, as Denkmann's rights upon which it based its claims in this litigation were real rights in immovable property which were not subject to the defense of estoppel."
[43] Plaintiffs' assignment of error No. 11 states: "The trial court erred in failing to rule the option was invalid as a matter of law for failure to adequately describe the price or mechanism for determining price and the thing to be sold, as required by the Louisiana Civil Code."
[44] Although we agree with the trial court that the option clause is enforceable, we note that our finding that the option clause is unambiguous relieves us of according special deference to the trial court's interpretation of the contract. See Schroeder v. Board of Supervisors of Louisiana State University, 591 So.2d 342 (La.1991).
[45] Plaintiffs' assignment of error No. 12 states: "The trial court erred in failing to find that the validity and enforceability of the option provision is strictly a matter of state law and that the Louisiana Arbitration Act and the Federal Arbitration Act are not applicable."

Plaintiffs' assignment of error No. 18 states, in pertinent part:
"The trial court's error in tendering legal questions to the jury was compounded by its failure to provide proper or complete instructions concerning such issues as the option...."
[46] Plaintiffs' assignment of error No. 13 states: "The trial court erred in failing to find that, as a party in breach, IP has no right to enforce the option."
[47] Plaintiffs' assignment of error No. 20 states: "The trial court, having instructed the jury on Denkmann's claims of negligence, erred in failing to give the jury a special interrogatory allowing the jury to decide Denkmann's negligence claims."

Plaintiffs' assignment of error No. 21 states: "The trial court, having earlier determined that Denkmann's breach of fiduciary duty claims required resolution at trial, then erred in failing to instruct the jury on fiduciary duty and in failing to give the jury a special interrogatory allowing it to decide Denkmann's breach of fiduciary duty claims."
[48] Plaintiffs' assignment of error No. 22 states: "The trial court erred in admitting testimony by former IP employees concerning conversations they allegedly had with a deceased Denkmann employee to vary the terms of an unambiguous contract."

Plaintiffs' assignment of error No. 23 states: "The trial court erred in admitting the presumptively prejudicial evidence of Denkmann's mineral wealth, which was irrelevant to any issue in the case and inadmissible under the La.Code of Evidence."
[49] Plaintiffs' assignment of error No. 24 states: "The trial court erred in excluding evidence of IP's attempts to affect the outcome of this litigation by introducing legislation to retroactively change the law with respect to: (1) the right of a lessor to obtain dissolution upon a lessee's breach of contract, and (2) the duty of a lessee to prevent and notify a lessor of encroachments on the leased property."
[50] Plaintiffs' assignment of error No. 26 states: "The trial court erred in failing to determine that legal interest runs in Denkmann's favor from the date of the breaches of the Agreement or, alternatively, the date IP was put in default (November 20, 1985) or, alternatively, that it runs from the date of the filing of the federal court action (August 15, 1986.)"
[51] Plaintiffs' assignment of error No. 27 reads: "The trial court erred in assessing Denkmann with one-half of the costs of this litigation and should have assessed all costs against IP."