JjSULLIVAN, Judge.
This suit is based upon a written lease of immovable property for use as a truck stop, restaurant, and video gaming parlor. The lessee appeals a judgment declaring that an option to renew the lease is unenforceable because it lacks a determinate price. The lessor has also appealed, objecting to the trial court’s finding that the lessee was not in default when it attempted to exercise the option to renew. For the following reasons, we affirm the judgment of the trial court in all respects.
*45 Facts and Procedural History
On April 28,1992, Tonas B. “Bill” Guillo-ry and T.B. Guillory, Inc., leased King’s Truck Stop and Lucky Lady Casino (King’s) in St. Landry Parish to O.M. 1 ¡^Investors, Inc. for the operation of a truck stop, restaurant, and video gaming parlor. T.B. Guillory, Inc. is a closely-held corporation owned by Mr. Guillory and his son, Blane Guillory. The principal shareholders in O.M. Investors, Inc. were Lamar Ozley and Don Williams. Subsequently, O.M. Investors, Inc. merged with North American Gaming Entertainment Corporation (North American), a publicly-traded company in which Mr. Ozley and Mr. Williams also have a significant ownership interest. (Mr. Ozley is North American’s acting chief executive officer.) North American then transferred its interest in the lease to O.M. Operating, L.L.C. (O.M. Operating).
The lease provided for a primary term of five years, from May 1, 1992 through April 30, 1997, with rent equal to “20% of the net revenue from the Video Poker Machines on the premises.” “Net Revenue” was defined as the “total money played in all machines, less all payout on winnings to players and less the fee paid the State of Louisiana as provided by Law.” The lessee assumed the obligations of renovating and operating the premises as a “first class twenty-four (24) hour restaurant and truck stop” and of purchasing between twenty and fifty video poker machines.
The lease also contained the following option that forms the basis of this dispute:
14. OPTION TO RENEW: Provided that Lessee is not in default in the 'performance of this lease, Lessee shall have the option to renew the Lease for three (3) additional five (5) year terms commencing at the expiration of the initial lease term or any renewal term. All terms and conditions of the lease shall apply during any renewal term except that the monthly percentage due Lessor shall be negotiable. The option shall be exercised by written notice given to Lessor not less than ninety (90) days prior to the expiration of the initial lease term or any renewal term. If notice is not given in the manner provided herein within the time specified, this option shall expire.
la(Emphasis added.)
On January 16, 1997, O.M. Operating timely notified Mr. Guillory of its intention to exercise this option. Between January and July of 1997, the parties exchanged several written proposals concerning the rent during the renewal term, but they failed to reach an agreement. On April 10, 1997, Mr. Guillory and T.B. Guillory, Inc. filed a petition to evict North American and O.M. Operating from the premises. In their answer, Defendants alleged that Plaintiffs refused to negotiate the price of the option in good faith. Defendants also filed a reconventional demand seeking specific performance of the option at a price set by the court or through negotiations by the parties or, alternatively, damages under unjust enrichment and attorney fees as provided in the lease. Plaintiffs later amended their petition to allege that Defendants breached their obligation to perform in good faith by opening another truck stop and video casino that directly competed with King’s.
Pat Willis, Jr., an attorney from Opelou-sas, Louisiana, negotiated the King’s lease on behalf of Mr. Guillory and T.B. Guillo-ry, Inc. Mr. Willis also drafted the final document. He testified that Mr. Ozley and Mr. Williams initially proposed a ten-year primary term with rent at ten percent of net gaming revenue and a ten-year option at the same rental rate. The parties eventually negotiated a five-year primary term at twenty percent of net gaming revenue and three five-year options, but at the time the lease was executed they were still unable to agree on the rent during the option periods.
Mr. Willis drafted the option to reflect the failure to agree on the price, believing *46 that the parties would negotiate in good faith at the time of renewal because they had done so initially. When Mr. Willis drafted the lease, he believed that the Uoption was enforceable, although he admitted that if the parties did not reach an agreement there would be no option. Mr. Willis later drafted similar contracts concerning the right to place video poker machines at other truck stops. In those documents or in his notes concerning those transactions, he used the terms “industry standards” or increases in “small increments” when referring to rent during renewal periods. However, Mr. Willis did not recall these terms in any discussions about the King’s lease.
Mr. Guillory testified that Mr. Ozley and Mr. Williams approached him about leasing King’s after the truck stop had been closed for six to eight months. (Mr. Guil-lory had decided to close King’s when Blane Guillory, its manager, returned to college.) Mr. Guillory believed that the lessee did not fulfill its obligation of operating a “first class” truck stop during the primary term of the lease. He often complained about the condition of the building’s appearance, the bathrooms, and the parking lot, eventually resurfacing the parking lot at his own expense. He also believed that Mr. Ozley and Mr. Williams breached their duty to perform in good faith when a corporation that they owned, Ozdon, Inc., opened the 1 — 49 Truck Stop and Gold Rush Casino (Gold Rush) within eight miles of King’s and which competed for King’s customers. (Ozdon, Inc. later sold full ownership of the Gold Rush to North American.) Although Mr. Guillory believed that the option required him to negotiate in good faith, he did not believe he would be forced to agree to terms that he found unacceptable.
Mr. Ozley testified that he initially proposed a ten-year lease with a ten-year option. Although he did not succeed in securing this commitment, he testified that he was happy with the lease that was negotiated. During the primary term, his | ..¡corporation invested approximately $300,-000 to improve the existing premises and another $300,000 to purchase the video poker machines. He stated that he would not have invested that amount of money for only a five-year commitment. He believed that the option would be negotiated at a “reasonable” price or at one that was not “artificially high.” However, he admitted that the parties had never discussed what would happen if they could not agree on a price at the time of renewal.
To address Mr. Guillory’s concern about competition from the Gold Rush and Mr. Ozley’s concern about continuing the business beyond the five-year primary term, the parties attempted to amend the lease in 1993. They drafted an agreement in which Mr. Guillory would receive forty percent of King’s net gaming revenue for twenty years, but he would then return the additional twenty percent to Mr. Ozley and Mr. Williams in exchange for twenty percent of the profits at the Gold Rush. They never implemented this arrangement, however, because of a misunderstanding about whether Mr. Guillory’s interest in the Gold Rush would be based on gaming revenue only or on profits from all concerns on the premises.
In a bench trial, the trial court limited the issues to whether the option was valid and whether the lessee was in default, leaving the questions of good faith, damages, and unjust enrichment to be determined at a later date. In written reasons, the trial court found that the option was unenforceable because it lacked a determinate price. Although not necessary to its holding, the trial court also determined that the lessee was not in default. From this ruling, both sides have appealed.
Opinion
La.Civ.Code art. 2760 provides that three things are “absolutely necessary” to the contract of lease: thing, price, and consent. “The price should be certain and [ fideterminate, and should consist of money. However, it may consist in a certain quantity of commodities, or even in a por *47 tion of the fruits yielded by the thing leased.” La.Civ.Code art. 2761. La.Civ. Code art. 2762 provides that the price may be left to a “third person named and determined,” but if this third person cannot or ■will not fix the price, there is no lease. Further, the contract is null “if the price were left to be fixed by a person not designated.” Id.
Defendants argue that this case is governed by Benglis Sash & Door Co. v. Leonards, 387 So.2d 1171 (La.1980), in which the supreme court upheld a contract of sale, notwithstanding the parties’ failure to set a price at the time of the sale. In Benglis, the defendant’s agent placed a special order for windows with a vendor that he frequently patronized. The vendor sued when the defendant refused to accept delivery of the windows. In finding that the parties consented to buy and sell the windows at a reasonable price, the supreme court relied on the history of prior dealings between the parties and the fact that the defendant did not object to the price that was charged.
Although Benglis involved the contract of sale, its rationale has been applied to the contract of lease. See Carmichael v. Gene Allen Air Service, Inc., 532 So.2d 407 (La.App. 3 Cir.), writ denied, 534 So.2d 447 (La.1988) (where circumstances, including the parties’ prior dealings, supported the finding of a lease of an airplane, even though no price was discussed at time of rental). However, we find both Benglis and Carmichael readily distinguishable from the present case. First, we note that the parties to the King’s lease had no prior business dealings. Second, and more important, the amount of the price in the Benglis and Carmichael cases was never at issue, whereas here it forms the basis of the dispute. Indeed, the present parties’ 17inability to agree on the price of the option has persisted throughout their business relationship. They could not agree in 1992 when they executed the lease, in 1993 when they attempted to amend it, and in 1997 at the conclusion of the primary term. In Benglis, the supreme court specifically distinguished those cases “in which the parties negotiated price but failed to agree, thereby creating circumstances under which one could not reasonably infer the parties implied consent to a reasonable price.” Id. at 1173 (emphasis added).
Defendants next argue that the option is enforceable because it provides a method of reaching a “certain and determinate” price, i.e., through negotiation. We disagree. In Louis Werner Sawmill Co. v. O’Shee, 111 La. 817, 821, 35 So. 919, 921 (1904) (emphasis added), the supreme court offered the following guidance in determining whether a price has been set:
“What is essential,” says Marcadé, Comm, on art. 1592, C. N., “is that the parties should have bound themselves in such way that the price may be thereafter determined as a mere consequence of the consent given by them, without any new act of volition on their part. If, for example, after the parties had said that the sale was made for a price as to which they would agree thereafter, they added, or which, in case of disagreement, should be fixed by an expert to be appointed by the parties themselves or by the judge of the district, it is clear that there would be a sale, since it would no longer be within the power of the parties to prevent the fixing of the price.. .”
In Mouton v. P.A. B., Inc., 450 So.2d 410, 413 (La.App. 3 Cir.), writ denied, 458 So.2d 118 (La.1984) (emphasis added), we stated that “[a]s long as the rent can be determined from factors or circumstances not unthin the control of the parties, the rent is certain.” Thus, in Mouton, we held that, where the rent was fixed at a percentage of net profits, one party could not unilaterally change the method of determining profits that had previously been used. In Bonfanti v. Davis, 487 So.2d ls 165 (La.App. 3 Cir.1986), we found that excess rent tied to a cost of living index was determinable, even though two such indexes resulted in slightly different fig *48 ures. See also Sealy v. Physicians & Surgeons Hosp., Inc., 480 So.2d 882 (La.App. 2 Cir.1985), unit denied, 483 So.2d 1024 (La.1986) (where an option reserving the landlord’s right to recalculate rent based upon the Department of Labor Consumer Price Index was held enforceable). In the instant case, similar provisions removing the determination of rent from the parties’ control are simply not present. Additionally, even if we agreed that such terms as “industry standards,” “going rate,” and increases in “small increments” could have produced a certain price, these words do not appear in the lease and were not discussed in the initial negotiations.
We also reject Defendants’ argument that setting a price by negotiation is tantamount to establishing a price by arbitration or through experts. Relying on experts or arbiters “providefs] a method by which a price could be determined by third parties in future negotiations, one that could not be frustrated by any act of commission or omission of buyer or seller.” I.P. Timberlands Operating Co., Ltd. v. Denmiss Corp., 93-1637, p. 52 (La.App. 1 Cir. 5/23/95); 657 So.2d 282, 313, writ denied, 95-1958 (La.10/27/95); 661 So.2d 1348 (emphasis added) (quoting Shell Oil Co. v. Texas Gas Transmission Corp., 210 So.2d 554, 560 (La.App. 4 Cir.), writ denied, 252 La. 847, 214 So.2d 165, 166 (1968)). Negotiation by the parties does not place the final determination into the hands of a third party, and the courts cannot assume that role. See La.Civ.Code art. 2762.
In their final argument, Defendants request that we remand the case for a determination of whether the Guillorys negotiated the price of the option in good faith. We find that such a remand would be futile. Mr. Willis, Mr. Ozley, and [9Mr. Guillory all stated that in 1992 everyone negotiated the lease in good faith, yet even then they could not agree on a price for the option. Good faith negotiations in 1997 would not necessarily have resulted in a later agreement, and bad faith negotiations would not have changed the fact that the option, as written, was never enforceable. For these same reasons, we also find that we need not address Plaintiffs’ appeal on the issue of default.
Decree
For the above reasons, the judgment of the trial court is affirmed. Costs of this appeal are assessed to North American Gaming Entertainment Corporation and O.M. Operating, L.L.C.
AFFIRMED.