# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 06-518


THEOPHILUS ROSE

VERSUS

BERNARD E. JOHNSON AND CELEBRITY PROFESSIONAL
SERVICES, INC.


\*\*\*\*\*\*\*\*\*\*


APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF LAFAYETTE, NO. 20001849
HONORABLE GLENNON P. EVERETT, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

## MARC T. AMY
## JUDGE

\*\*\*\*\*\*\*\*\*\*

Court composed of Oswald A. Decuir, Marc T. Amy, and Billy Howard Ezell, Judges.

**AFFIRMED.**

Neil G. Vincent
Allen & Gooch
Post Office Box 3768
Lafayette, LA   70502-3768
(337) 291-1000
COUNSEL FOR PLAINTIFF/APPELLEE:
        Theophilus Rose

Derriel C. McCorvey
Post Office Box 2473
Lafayette, LA   70502
(337) 291-2431
COUNSEL FOR DEFENDANT/APPELLANT:
        Bernard Johnson

AMY, Judge.

The defendant allegedly purchased property on behalf of the plaintiff. When the property faced foreclosure, the defendant asked the plaintiff for assistance. The plaintiff discussed the matter with his brother-in-law who agreed to purchase a portion of the property for a sum that would allow the defendant to pay off the mortgage. Prior to the purchase, the brother-in-law imposed certain conditions, to which the defendant allegedly agreed. In addition to the cash sale, a donation *inter vivos* was executed, in which the defendant donated the remaining property to the plaintiff. The plaintiff filed suit to enforce the validity of the act of donation. The trial court ruled in the plaintiff's favor. The defendant now appeals, arguing that the trial court erred in finding that he intended to donate the property, in not finding the donation was a product of error or duress, and in not considering whether the donation was a nullity under La.Civ.Code art. 1498. For the following reasons, we affirm.

### Factual and Procedural Background

In 1994, Bernard Johnson purchased thirty-one acres of land located on Moss Street in Lafayette, Louisiana. Because he was unable to pay the mortgage in 1996, Johnson contacted his nephew, Theophilus Rose, to assist him in making the payments and preventing foreclosure on the property. Rose, who testified that he wanted to purchase the property himself but lacked the funds to do so, discussed Johnson's predicament with his brother-in-law, Dr. Bryan LeBean, Sr. Rose and LeBean decided that LeBean would procure a loan and purchase 11.5 acres of the property for $213,000.00. This sum would pay off the mortgage, unpaid taxes, and another encumbrance. According to Rose, Johnson would receive the remaining sum of $25,000.00.

At trial, LeBean explained that he imposed two conditions on his purchase. First, he did not want to buy the 11.5 acres from Johnson because he "couldn't get along with Bernard Johnson." LeBean wanted Johnson to sell the property to Rose, who would then sell it back to him. Second, LeBean did not want to own any property adjacent to property that Johnson owned; therefore, he wanted Johnson to transfer the remaining property to Rose. Rose and LeBean both testified that they informed Johnson of the conditions and that he agreed to them.

LeBean subsequently procured a loan to buy 11.5 acres of the property. Johnson, Rose, and Rose's wife went to the office of Alfred Boustany, a notary-attorney, to execute the transfers of the property. Johnson and Rose entered into a cash sale deed for the 11.5 acres, and Johnson executed a donation *inter vivos* in favor of Rose for the remaining 19.5 acres. Boustany notarized the transactions in the presence of two witnesses. The parties were given copies of the documents when they left Boustany's office.

According to Johnson, he signed the cash sale deed first and then signed the donation believing that it was a copy of the cash sale deed. He maintained that he did not read the donation. Johnson testified that a week had passed before he realized that he had donated the remaining property to Rose. He further testified that he did not intend to donate the property to Rose and that had he known of this condition, he would not have sold a portion of the property to LeBean. According to Johnson, he told Rose that he unknowingly signed the donation document and asked that Rose transfer the property back to his name, to which Rose allegedly agreed. Johnson testified that he later received a letter from Rose stating that he spoke with Boustany

2

and that he had "changed his mind"; he was not going to transfer the property back to Johnson.

Johnson testified that he then used a 1983 power of attorney that he held on Rose's behalf to execute a quitclaim deed and put the property back in his name. Rose testified that Johnson did not tell him his intentions or ask for his authority to do so. Once the quitclaim deed was executed, Johnson sold the property to Celebrity Professional Services, Inc., a family-owned company in which he was president. According to Rose, Johnson sent him a letter offering to sell him the property for $300,000.00. Rose refused and subsequently filed this suit to have the quitclaim deed annulled. Johnson responded by filing a reconventional demand claiming that the donation *inter vivos* was invalid and that the initial transfer to Rose was a nullity.

Following a bench trial, the trial court found in Rose's favor. It upheld the donation and annulled the quitclaim deed, which thereby nullified the sale to Celebrity Professional Services, Inc. It is from this judgment that Johnson appeals, designating the following as error:

I.  The trial court erred in concluding that the factual findings of this case uphold the *inter vivos* donation from Johnson to Rose.

     a.  The trial court erred in concluding the facts of this case indicate that Johnson intended to donate his property *inter vivos* to Rose.

     b.  The trial court erred in concluding the facts of this case did not indicate that Johnson donated his property *inter vivos* as a product of fraud or duress. Or that if those facts did exist, in not basing its ruling on that.

II.  The trial court erred in failing to consider whether the *inter vivos* donation at hand is a nullity under LSA-C.C. Art. 1498.

3

**Discussion**

*Donative Intent*

Johnson argues that the donation *inter vivos* should be held invalid because he never intended to donate the property. Furthermore, he argues that the authentic act itself is insufficient to prove donative intent insofar as he did not know that he signed a donation.

"A donation *inter vivos* (between living persons) is an act by which the donor divests himself, at present and irrevocably, of the thing given, in favor of the donee who accepts it." La.Civ.Code art. 1468. Every donation *inter vivos* of immovable property shall be passed before a notary public and two witnesses or it shall be deemed null and void. La.Civ.Code art. 1536. "Although the donation may be valid as to form, the substantive requirements of a divestment and donative intent must be fulfilled in order to effect a valid donation." *Fogg v. Fogg*, 571 So.2d 838, 841-42 (La.App. 3 Cir. 1990), *writ denied*, 575 So.2d 372 (La.1991). Donative intent is a factual issue and is reviewed on appeal under the manifest error standard of review. *Thomson v. Thomson*, 34,353 (La.App. 2 Cir. 1/24/01), 778 So.2d 736.

In its oral reasons for judgment, the trial court stated as follows with regard to the alleged donation:

> Now, you [Johnson] have filed a reconventional demand through your lawyers which says that: I didn't know what I was signing at the time that I signed a donation. By your own admission, the witnesses and the notary were present at the time you and all parties signed the documents. So it is clearly in proper form.

Insofar as the donation was executed in the presence of a notary and two witnesses, we find no error in the trial court's determination that the donation has met the form requirements of La.Civ.Code art. 1536. Therefore, the pertinent issue is

whether the trial court was manifestly erroneous in determining that Rose proved that Johnson intended to donate this property to him.

Rose testified that he, not Johnson, first located the property in 1989. Because of financial difficulties, Rose was not able to purchase the property. Rose testified that because his uncle previously offered him financial assistance, he called Johnson and: "I told him about the property. And I asked him would he help me. And he said, 'Yes.'" Johnson purchased the property in 1994 and put it in his name. When asked if he had any objections to putting the property in Johnson's name, Rose answered: "No, I trusted him. We were like father and son. We didn't have any problems."

Rose testified that two years after the property was acquired, Johnson began experiencing financial problems, and the property was facing foreclosure. Rose testified that Johnson called and asked him for help; he agreed. Because Rose was not able to borrow the money himself, he "asked [LeBean] would he do a loan. We went and took out a loan to bring up the arrear." Rose testified that, after making the mortgage current, he and LeBean paid back the loan.

One year later, the property was again facing foreclosure. Rose stated that Johnson asked him what he was going to do. Since the two could not get financing elsewhere, Rose again turned to LeBean. Rose testified as follows:

> I pleaded with him to help me save the land because he didn't want to do more business with my uncle. . . . Dr. LeBean was unable to borrow all the money but he put a down payment on the -- for the property. So what I done was, he wanted nine acres of land and I lent him two and a half acres of land to get him more collateral so he could have enough to put -- to make it where he was able to get it without coming up with the money, without coming up with the down payment. . . . I told my uncle exactly what I was doing. And my uncle said, "Well, Fish, you gotta do something. You gotta do something." I say, "Unc," I say, "if I get this

land," I say, "I don't want no strings attached with you coming and trying to force me to do this, that, or one thing or another."

When asked whether he discussed LeBean's conditions with his uncle, Rose stated:

> I told him. I told him and also Dr. LeBean and I went to Neil Vincent's office, which was Dr. LeBean's attorney. And they had a conference call and Dr. LeBean told my uncle that the only way that he would purchase this property is if I was the sole owner of the property and he would not buy no property from him.

Rose testified that Johnson agreed to the conditions insofar as he "did not make no complaints, no objections to nothing. My uncle came and we went to Alfred Boustany and he told Alfred Boustany, 'Just fix the damn papers'. . . . And Freddie fixed the documents." According to Rose, he, his wife, and Johnson went to Boustany's office on December 19, 1997, to sign the documents. He stated that while they were in the reception room, Boustany handed him and Johnson a set of documents to read.[1] Rose testified that Johnson read the sale and donation documents.

Rose testified that he, his wife, Johnson, Boustany, Boustany's mother, and Boustany's secretary went into the conference room to execute the documents. According to Rose, Boustany went over the documents and he "told my uncle, he say, 'Once you sign these documents, you have no control of the property. Do you understand that, Bernard?'" Rose stated that Johnson understood as he did not voice any complaints or ask any questions. Rose and Johnson signed the documents as did Boustany's secretary and Rose's wife who were witnesses. Rose testified that before leaving the office, Rose and Johnson were given copies of the documents. Three days later, according to the record, the sale from Rose to LeBean was executed. Once

---

[1] Rose stated that he is dyslexic, so he handed the documents to his wife to read for him.

again, Rose testified that Johnson did not complain about the donation or the transfer of the property on that day.

According to Johnson, he did not complain about the donation because he did not know that he had signed one "until [he] opened it [the copy] probably a week or so afterwards." In fact, Johnson stated that he did not even know what a donation *inter vivos* was. He explained that he understood the concept when:

> I went back home and I found out that I had given the land away and Rose was going around telling people that he got this, he got that, or whatever. So when it dawned on me that it was the total land [that] was given to Rose, I say, "No, that -- I didn't want to do that." I mean, I don't go around buying land for somebody else.

Johnson testified that he found out the property was for sale from a sign posted on the lot; Rose did not inform him of the sale. He further testified that when he purchased the land in 1994, "[i]t wasn't bought for Theophilus Rose. It was bought for my retirement and my family." Accordingly, the property was not put in Rose's name.

At trial, Johnson maintained that there never was a discussion with Rose, LeBean, or Boustany about donating the property to Rose. Johnson remembered that Rose "communicated to me that Dr. LeBean did not want to buy it from me, but he did not communicate that I had to give the rest of the property to him. And I never would have agreed to that. Never." He stated that his primary purpose for selling the property to LeBean was to "clear the property," meaning that the mortgage would be paid off and the property could not be foreclosed upon.

When Johnson was called by plaintiff's counsel under cross-examination, he alleged that on the day the documents were executed, Boustany did not give him copies of the documents to go over. Nor did Boustany read the donation or explain

the documents to him. However, Johnson's direct testimony the next day indicated that Boustany had provided him with copies of both documents and that he remembered him reading the sales document aloud, although he was unsure if Boustany had read the donation document. Johnson testified that he read the sales document and "I saw that I was selling enough acreage to clear the property. That's all I was concerned with. . . . I immediately signed the -- the other document [the donation] which I thought was a duplicate."

Alfred Boustany, the notary-attorney who oversaw the execution of these documents, testified that Johnson knew what he was signing insofar as he and Rose initially approached him about doing a donation. According to Boustany, he initially prepared an onerous and remunerative donation, which was not used[2] because "there was some question about a donation and lesion beyond moity and the title and that sort of thing." Boustany testified that it was then suggested that a donation and sale be done instead.

According to Boustany, Johnson never objected to doing the donation or transferring the property in Rose's name. When asked if it was clear to the parties that the property was going to be transferred to Rose, Boustany answered: "Yes. This property was always intended for Theophilus Rose from the very beginning. That was the idea from the very beginning. Bernard was there to help his nephew. At least that's the impression that they gave to me."

Boustany explained the procedure that was followed the day the documents were executed. He stated that he provided Johnson and Rose with copies of the documents to review for any errors. The parties and the witnesses then entered the

---

[2] The unsigned onerous and remunerative donation was entered into evidence.

conference room, where he went over each document. Boustany admitted that he did not go over the documents word for word. He recalled that:

> And I told him, I said, "Look, Bernard, there are two documents. In one case you're selling part of the property, in the other you're donating. Do you understand?". . . . I said, "Bernard, is this what you want to do? Do you understand once this is done, you will have nothing more to do with the property? Do you understand that?" And he said, "Yes." And then what we do at that point is we basically pass the documents around for each party to sign and then for the witnesses to sign and for me to sign. We did that for both documents.

In its ruling, the trial court found Boustany's testimony persuasive, stating:

> But the testimony of Mr. Boustany tipped the scales in favor of Mr. Rose. His testimony is clear that there was never any subterfuge and that throughout this process he was preparing the documents at the behest of you both. Frankly, that's not unusual in the legal business with respect to real estate transactions. It's done every day.
>
> . . . .
>
> Under those circumstances, your reconventional demand must fail. Now, Sir, I am going to again tell you that this is not to suggest that you have come in here and tried to tell the Court anything other than what you believe to be true, but I must apply the law of Louisiana in deciding this case.

This type of credibility determination and weighing of the evidence is within the province of the trial court. *Rosell v. ESCO*, 549 So.2d 840 (La.1989); *Fox v. Anderson*, 05-934 (La.App. 3 Cir. 3/1/06), 924 So.2d 399, *writ denied*, 06-722 (La. 6/23/96), 903 So.2d 977. Our review of the record reveals support for the determination that Rose proved that Johnson intended to donate the property to him. Both Boustany and Rose testified that the parties approached Boustany about executing a donation *inter vivos*. Furthermore, the circumstances surrounding the execution of the donation, *i.e.*, the reading of the documents and Johnson stating that he understands the consequences, supports the assertion that Johnson was fully aware

9

that he was donating the land to Rose. Accordingly, we find no manifest error in the trial court's determination that the donation *inter vivos* was valid.

This assignment has no merit.

*Fraud*

Johnson argues, in the alternative, that the trial court erred in not finding that the donation was null insofar as it was procured by fraud. Johnson alleges that neither Rose nor his wife mentioned to Boustany that Johnson had a wife and children, "facts that complicate execution of an *inter vivos* donation." Fraud was also perpetrated, according to Johnson, by the fact that Boustany did not explain the donation "word for word" to him. He reiterates that he assumed he was signing a copy of the sales document.

Louisiana Civil Code Article 1483 provides in pertinent part:

> A person who challenges a donation because of fraud, duress, or undue influence, must prove it by clear and convincing evidence. However, if, at the time the donation was made or the testament executed, a relationship of confidence existed between the donor and the wrongdoer and the wrongdoer was not then related to the donor by affinity, consanguinity or adoption, the person who challenges the donation need only prove the fraud, duress, or undue influence by a preponderance of the evidence.

In *Mack v. Evans*, 35,364, p. 3 (La.App. 2 Cir. 12/5/01), 804 So.2d 730, 733, *writ denied*, 02-422 (La. 4/19/02), 813 So.2d 1088, the second circuit stated that "[t]he two elements essential to establishing legal fraud are an intent to defraud or gain an unfair advantage and a resulting loss or damage. La. C.C. art. 1953; *Heyl v. Heyl*, 445 So.2d 88 (La.App. 2d Cir.1984), *writ denied*, 446 So.2d 1228 (La.1984)." Louisiana Civil Code Article 1478 states that "[a] donation *inter vivos* or *mortis causa* shall be declared null upon proof that it is the product of fraud or duress."

10

Because Rose is related to Johnson by consanguinity, Johnson was required to prove fraud or duress by clear and convincing evidence. *See* La.Civ.Code art. 1483. Johnson argues that the circumstances surrounding the execution of the donation supports his assertion that Rose intended to defraud him or gain an unfair advantage. Johnson references the fact that when executing the donation, Rose did not inform Boustany that Johnson had a wife and children. Boustany testified that before the donation was executed, he provided Johnson and Rose with copies of both documents so that they could check for any errors. Johnson testified that he read over the sales document. We note that in the second paragraph it states that Johnson was married; however, there is no mention of his children. Again, Johnson testified that he read the document.

Furthermore, the record does not indicate that Johnson asked for clarification so as to indicate confusion as to the act of donation. As previously mentioned, Boustany testified that he told Johnson that he would no longer own the property once the donation was executed, and Johnson stated that he understood. Based on Boustany's testimony and the evidence before us, we find no indication that the trial court was required to find fraud. *See Nofsinger v. Hinchee*, 199 So. 597, 599 (La.App. 1 Cir. 1941) ("[o]n the whole and in view of the positive testimony of the notary-attorney who appears to be reputable, we cannot say that any fraud . . . has been committed.").

Accordingly, this assignment is without merit.

*Duress*

Johnson also argues that the donation should be declared null because it was procured by duress. He asserts that at the time of donation, he was eighty years of

age and experiencing financial difficulties. According to Johnson, he was under economic duress because he used his life savings to purchase the property. He contends that flying back and forth from California, where he resides, to Louisiana, where the property is, impacted him financially.

Johnson also contends that he "has difficulty following what others tell him," and "must rely on others to help him conduct business — especially while he lives on the other side of the country." Because of this, Johnson argues, he "allowed his nephew Rose to handle preliminary negotiations for him[.]" He contends that his duress, "combined with Rose's undue influence over [him], caused [him] to execute the authentic act."

Louisiana Civil Code Article 1959 provides in pertinent part:

> Consent is vitiated when it has been obtained by duress of such a nature as to cause a reasonable fear of unjust and considerable injury to a party's person, property, or reputation.

> Age, health, disposition, and other personal circumstances of a party must be taken into account in determining reasonableness of the fear.

Louisiana Civil Code Article 1479 provides:

> A donation *inter vivos* or *mortis causa* shall be declared null upon proof that it is the product of influence by the donee or another person that so impaired the volition of the donor as to substitute the volition of the donee or other person for the volition of the donor.

Although the record shows that Johnson was eighty years of age at the time of the donation, there is no indication that he had any physical or mental incapacity that rendered him incapable of understanding what he was signing. Further, this was not the first time that Johnson had completed a real estate transaction. Johnson testified that he bought and sold property for approximately forty years and that he was a

licensed real estate agent for more than ten years. As such, he was in a superior position to appreciate the seriousness and consequences of his actions.

It bears repeating that Johnson was aware that LeBean would not buy 11.5 acres of the property if Johnson owned the remainder; LeBean required that Rose owned the remainder. Rather than sell the property to LeBean, Johnson had the option of finding someone else to purchase it. Furthermore, the trial court was aware that Johnson had traveled from California to Louisiana every "thirty or forty days" and was free to conclude that he was not in extreme financial difficulty. Given this evidence, we do not find that the trial court was required to find that the transaction resulted from duress. Neither does the evidence support Johnson's assertion of undue influence.

This assignment is without merit.

*Louisiana Civil Code Article 1498*

Johnson argues that the facts of this case bring it under the purview of La.Civ.Code art. 1498, which provides in pertinent part:

> The donation *inter vivos* shall in no case divest the donor of all his property; he must reserve to himself enough for subsistence. If he does not do so, a donation of . . . an immovable is null for the whole unless the donee has alienated the immovable by onerous title . . . .

He contends that it was not necessary for him to plead La.Civ.Code art. 1498 in his initial pleadings as such a finding yields an absolute nullity. Citing La.Civ.Code art. 2030, Johnson asserts that absolute nullities "may be raised at any point in the proceedings — and by the court itself on its own initiative." Therefore, he argues that the trial court erred in not finding the donation *inter vivos* a nullity.

13

When plaintiff's counsel raised an objection to defense counsel's question concerning whether Johnson had any other assets besides this property, the trial court explained:

> I hesitate to allow the question to be answered because I don't want to expand the pleadings in any way. There is some Louisiana law that says you cannot donate away all of your property and make yourself a ward of the state or place yourself in a destitute position. That has not been pled. In any event, for purposes of what he intended or did not intend in December of 1997, it is relevant but I'm not going to allow that to be used to expand the pleadings.

After reviewing the jurisprudence, we find no error in the trial court's determination in this regard. "[Article 2030] provides that the absolute nullity of the contract may be pled by any party or noticed by the court." *IP Timberlands Operating Co.*, *Ltd. v. Denmiss Corp.*, 93 1367, p. 10 (La.App. 1 Cir. 5/23/95), 657 So.2d 282, 291, *writ denied*, 95-1958 (La. 10/27/95), 661 So.2d 1348 (emphasis added). If the defendant does not assert a claim in his answer or reconventional demand, that claim cannot serve as a basis for judgment. *Romero v. State Farm Fire & Cas. Co.*, 479 So.2d 694 (La.App. 3 Cir. 1985) (*citing Homes v. James Buckley & Co.*, 165 La. 874, 116 So. 218 (La.1928)). *See Succession of Webre*, 164 So.2d 49, 51-52 (La.App. 4 Cir. 1964) (where the court "searched the pleadings in this case in vain to find some allegation which might be interpreted as pleading the nullity of [Article 1498]. . . . Finding no such allegation, we have no right to assume that the deeds in question, alleged to be donations in disguise, were stricken with such nullity."). As the allegations regarding this claim were raised for the first time at trial, the trial court did not err in ruling as it did.

This assignment lacks merit.

**DECREE**

For the above reasons, the judgment of the trial court is affirmed. All costs of these proceedings are assessed against the defendant, Bernard E. Johnson.

**AFFIRMED.**